In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 07-1957

PHILLIS DEWITT,

*Plaintiff-Appellant,*

*v.*

PROCTOR HOSPITAL, an Illinois not-for-profit corporation,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 06 C 1181—**Joe Billy McDade**, *Judge.*

_____

ARGUED NOVEMBER 29, 2007—DECIDED FEBRUARY 27, 2008

_____

Before CUDAHY, POSNER, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* After she was fired from her job as a registered nurse at Proctor Hospital, 47-year-old Phillis Dewitt sued, alleging "association discrimination" under the Americans with Disabilities Act (ADA) as well as age and gender discrimination. The district court entered summary judgment in favor of Proctor. The court also denied Dewitt's motion for leave to amend her complaint to add a claim of ERISA retaliation. Today we resolve Dewitt's appeal from those decisions.

In September 2001, Proctor, a hospital in Peoria, Illinois, hired Dewitt to work as a nurse on an "as-needed" basis. Proctor apparently liked how Dewitt did her job because the following month she was promoted to the permanent position of second-shift clinical manager. In that role, Dewitt supervised nurses and other Proctor staff members.

Three years into the job, Dewitt switched to the first-shift clinical manager slot. In the summer of 2005, she switched to a part-time schedule, sharing the responsibilities of second-shift clinical manager with a coworker.

Dewitt, it appears (for we must assume the facts to be as she presents them at this stage of the proceedings), was a valuable employee. In her last evaluation, her supervisor, Mary Jane Davis, described her as an "outstanding clinical manager [who] consistently goes the extra mile." But things were not quite as rosy as they appeared.

Dewitt and her husband, Anthony, were covered under Proctor's health insurance plan. Throughout Dewitt's tenure at Proctor, Anthony suffered from prostate cancer and received expensive medical care. His covered medical expenses were paid by Proctor, which was partially self-insured. It paid for members' covered medical costs up to $250,000 per year. Anything above this "stop-loss" figure was covered by a policy issued by the Standard Security Life Insurance Company of New York.

Dewitt was able to maintain health insurance coverage for herself and Anthony even during her short part-time stint, since Proctor credited Dewitt with "hospital approved absence" (unpaid time), allowing her to reach the minimum number of hours necessary to qualify for benefits.

Since Proctor was self-insured, it took a keen interest in the medical claims submitted by its employees. Each quarter, in fact, Progressive Benefits Services, the administrator of Proctor's medical plan, prepared a "stop-loss report" for Linda K. Buck, Proctor's vice-president of human resources. The report identified all employees whose recent medical claims exceeded $25,000.

The stop-loss reports highlighted Dewitt's expenses. Although Dewitt was not listed on reports for 2001 and 2002 (indicating that her family's medical expenses, particularly those of her husband, were less than $25,000), during the next three years Anthony underwent costly medical procedures. In 2003, the Dewitts' medical claims for Anthony were $71,684. In 2004, the figure jumped to $177,826. In the first eight months of 2005, the expenses were $67,281.50.

In September 2004, Davis confronted Dewitt about Anthony's high medical claims. Specifically, she asked what treatment Anthony was receiving, and Dewitt responded that he was undergoing chemotherapy and radiation. Davis asked Dewitt if she had considered hospice care for her husband; Dewitt responded that Anthony's doctor considered less expensive hospice care placement to be premature. Davis explained that a committee was reviewing Anthony's medical expenses, which she described as unusually high.

In February 2005, Davis again pulled Dewitt aside to ask about Anthony's treatment. Dewitt informed her that Anthony's situation had not changed.

In May 2005, Davis organized a meeting for Proctor's clinical managers. She informed the employees that Proctor faced financial troubles, which, according to Davis, required a "creative" effort to cut costs.

Proctor fired Dewitt on August 3, 2005, and designated her as "ineligible to be rehired in the future." Proctor provided no explanation for its "ineligible for rehire" decision.[1] Dewitt's medical benefits with Proctor continued through the end of August. After that, Dewitt paid for COBRA coverage (which she was able to get for a maximum of 18 months) for herself and her husband. But 18 months, as it turned out, wasn't necessary as Anthony, a year and a week after Dewitt was fired, gave up his fight with cancer. He died on August 9, 2006.

Dewitt's age and gender discrimination claims can be quickly resolved. On her age claim, she says she was replaced by a 25-year-old woman named Michelle Patton. But Dewitt's "evidence" on this point is nothing more than a statement in her affidavit which is not based on her personal knowledge. Proctor, on the other hand, offers personal knowledge from Ms. Buck to the effect that during the two months following Dewitt's discharge, several different employees (a total of eight is suggested) filled her spot before it was given, permanently, to Sarilee Glover, who was 57 years old. Dewitt's inability to satisfy the requirement, under the often-cited *McDonnell Douglas* test, that she was replaced by someone outside the protected group—someone under 40 years of age—dooms her age discrimination claim.

Ditto for her gender discrimination claim, where Dewitt alleges that a male employee with high medical expenses, a chap named Ray Lockhart, was not fired. But Lock-

---

[1] In its brief, Proctor says, without elaboration, that Dewitt was fired for "insubordination." That may well be Proctor's position as this case moves forward, but it is not something that has been developed so far.

hart's medical expenses were actually quite modest as compared to Dewitt's. In 2004, his expenses were $4,114.05, a staggering $173,712.32 short of Dewitt's total. On top of that, Dewitt offers next to nothing about Lockhart's job responsibilities other than to say he was a registered nurse and an emergency room manager. The district court, on this sparse record, correctly concluded that Dewitt's gender discrimination claim had to fail because she did not, again as required by the ubiquitous *McDonnell Douglas* test, identify a "similarly situated" member of the other sex who received more favorable treatment from the hospital.

Now we come to Dewitt's best claim as she invokes the infrequently litigated "association discrimination" section of the ADA. Under 42 U.S.C. § 12112(b)(4), an employer is prohibited from discriminating against an employee as a result of "the known disability of an individual with whom [the employee] is known to have a relationship or association." Specifically, she alleges that Proctor fired her to avoid having to continue to pay for the substantial medical costs that were being incurred by her husband under Proctor's self-insured health insurance plan.

In our seminal case on this issue, *Larimer v. International Business Machines Corp.*, 370 F.3d 698, 700 (7th Cir. 2004), we outlined three categories into which "association discrimination" plaintiffs generally fall. We called them (1) expense; (2) disability by association; and (3) distraction. In the "expense" scenario, we noted that an employee, fired because her spouse has a disability that is costly to the employer (i.e., he is covered by the company's health plan) is within the intended scope of the "associational discrimination" section of the ADA.

The *McDonnell Douglas* test is not easily adaptable to claims under the section of the ADA that permits causes of action for association discrimination. It's a bit like a mean stepsister trying to push her big foot into one of Cinderella's tiny glass slippers. In *Larimer*, we struggled with the task of reformulating the *McDonnell Douglas* test, suggesting that a similar effort in *Den Hartog v. Wasatch Academy*, 129 F.3d 1076 (10th Cir. 1997), while close to the mark, could be tweaked and improved. And so we suggested that a plaintiff, without direct evidence of discrimination, could prove her case by establishing that: (1) she was qualified for the job at the time of the adverse employment action; (2) she was subjected to an adverse employment action; (3) she was known by her employer at the time to have a relative or associate with a disability; and (4) her case falls into one of the three relevant categories of expense, distraction, or association. *Larimer*, 370 F.3d at 701-02.

While all this may be well and good, we think Dewitt's case, in the final analysis, does not have to be considered in light of the tweaked *McDonnell Douglas* test because she has fairly persuasive circumstantial evidence suggesting that her case is best viewed as one relying on direct evidence. And so, we think, a jury should consider her claim.

The uncontroverted evidence suggests that Proctor, which faced financial trouble, was very concerned about cutting costs. Because Proctor's unusually high "stop-loss" coverage didn't kick in until claims exceeded $250,000, it personally felt the heavy bite of Dewitt's expenses. Proctor wasn't discreet about its concerns: in the May 2005 meeting, Davis informed Proctor's clinical managers that the hospital would have to be "creative" in cutting costs.

That the powers-that-be at Proctor were interested specifically in the high cost of Anthony's medical treatment is obvious. Davis, Dewitt's supervisor (and the person who ultimately fired her), pulled Dewitt aside twice in five months to inquire about Anthony's condition. These conversations indicate that Davis was very interested in limiting Anthony's claims. During their first chat, Davis informed Dewitt that a Proctor committee was reviewing Anthony's unusually high medical expenses. She also asked Dewitt whether Anthony's doctor had considered hospice placement—a far cheaper "alternative" to the costly chemotherapy and radiation Anthony was receiving.

Finally, the timing of Dewitt's termination suggests that the financial albatross of Anthony's continued cancer treatment was an important factor in Proctor's decision. Dewitt was fired in August 2005—five months after her last chat with Davis and three months after Proctor warned employees about impending "creative" cost-cutting measures. One could reasonably infer that Dewitt was terminated after Proctor conducted its latest periodic analysis of medical claim "outliers" and, this time around, decided that its "wait and see" strategy with the Dewitts was costing the hospital tens of thousands of dollars every year. A reasonable juror could conclude that Proctor, which faced a financial struggle of indeterminate length, was concerned that Anthony—a multi-year cancer veteran—might linger on indefinitely. This later fact distinguishes Dewitt's case from the situation in *Larimer* where the fired employee's twin daughters were "healthy and normal" and thus no longer disabled when the employment termination decision was made.

Proctor makes several arguments, none of which we find persuasive. It contends that its decision to terminate

Dewitt could not have been based on the high cost of Anthony's cancer treatment because the medical expenses of other female employees exceeded those of Dewitt. Specifically, Proctor points to evidence that in 2003, 2004, and 2005, Dewitt's claims were exceeded by those of one or two other employees. It is unclear, however, whether these employees (or other plan members), like Anthony, had conditions that Proctor feared would require prolonged, expensive medical treatment which could potentially continue far into the future. Thus, without a comparison of employees' cumulative medical expenses and treatment predictions, this argument has little appeal on the basis of this record at the summary judgment stage of the case.

In support of its claim that it never sought to restrict the Dewitts' access to health insurance, Proctor points to its decision to help Dewitt maintain her coverage when she switched to a part-time schedule in the summer of 2005. According to Dewitt, however, her switch to a part-time schedule was contingent on Proctor continuing her medical benefits. Since we must interpret the facts in Dewitt's favor, we therefore assume that Proctor was well-aware that regardless of how it responded to her request to maintain her health coverage, Dewitt would not have relinquished her benefits voluntarily.

Finally, Proctor argues that firing Dewitt would not have accomplished the goal Dewitt attributes to it— freeing itself of Anthony's steep medical bills—since Dewitt was eligible for post-termination COBRA insurance. This argument, however, leaves out an important piece of the puzzle. Even if Proctor shared some financial responsibility for the continuation of benefits, it would nonetheless save money by terminating Dewitt,

since it feared that Anthony's expensive treatment might continue indefinitely and the COBRA coverage would expire after 18 months.

Because Dewitt has established that direct evidence of "association discrimination" may have motivated Proctor in its decision to fire her, a jury should be allowed to consider her claim.

Lastly, Dewitt contends that the court erred in refusing to allow her to amend her complaint to add a claim of ERISA retaliation. The district court denied Dewitt's motion on the basis of futility, since it determined that her claim would have ultimately failed. We review the district court's decision to deny a motion for leave to amend for an abuse of discretion. *Cacia ex rel. Randolph v. Norfolk & Western Ry. Co.*, 290 F.3d 914, 921 (7th Cir. 2002).

Under § 510 of ERISA, an employer may not discharge "a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan." 29 U.S.C. § 1140. This provision is intended to discourage employers from discharging or harassing their employees in an attempt to prevent them from using their pension or medical benefits. *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1998).

To determine whether the district court properly rejected Dewitt's amendment as futile, we must determine whether her ERISA retaliation claim would survive a motion for summary judgment. *See Sound of Music Co. v. Minnesota Min. & Mfg. Co.*, 477 F.3d 910, 923 (7th Cir. 2007). If Proctor had a legitimate, nondiscriminatory reason for firing Dewitt, she would be out of luck. She would not then be able to show retaliation. *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 796 (7th Cir. 2005). Because, however, Proctor elected

not to push its apparent position that Dewitt was fired for insubordination, Dewitt should have been allowed to amend her complaint to include an allegation of ERISA retaliation.

A reasonable jury could conclude that Proctor retaliated against Dewitt, and thus committed an ERISA violation, when they showed her the door on August 3, 2005. But that said, we note that Dewitt's two claims, one under the ADA and the other under ERISA, overlap, perhaps completely. Both essentially present the same factual question—why did Proctor fire Dewitt? If a jury were to find that Dewitt was fired for insubordination, not because her husband was costing the hospital a ton of money under its self-insured medical plan, that would be the end of the case. If the insubordination defense is rejected and the jury concludes that Anthony's expenses were the real motivating factor, damages—whether based on a discrimination claim under the ADA or a retaliation claim under ERISA—would seem to be the same. With that being the situation, on remand, some thought should be given to whether having two claims here instead of one does anything other than unduly complicate the proceedings.

For these reasons, we AFFIRM the district court's grant of summary judgment to Proctor on Dewitt's age and gender discrimination claims. We REVERSE both the grant of summary judgment on the ADA association discrimination claim and the denial of Dewitt's motion to amend her complaint. The case is REMANDED to the district court for further proceedings.

POSNER, *Circuit Judge*, concurring.   I agree with the decision and with most of Judge Evans's characteristically lucid majority opinion. I write separately to raise two questions that seem to me to be worth flagging although they do not have to be answered to decide the case—the alternative ways of establishing a prima facie case of discrimination and their suitability to the discrimination charged in this case—and a third question—the difference between discrimination on grounds of expense and discrimination on grounds forbidden by federal law—regarding which the discussion in the majority opinion seems to me incomplete and potentially misleading.

The standard understanding is that there are two ways to make out a prima facie case of discrimination—which is to say, a showing in advance of trial sufficient to defeat the defendant's motion for summary judgment. They are the "direct method" and the "indirect method," the latter being that of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); see, e.g., *Timmons v. General Motors Corp.*, 469 F.3d 1122, 1126-27 (7th Cir. 2006). The direct method is the one that litigants would use if there were no *McDonnell Douglas* test. The plaintiff would marshal all his direct and circumstantial evidence of discrimination ("direct" here meaning, as distinct from its use in the phrase "direct method," evidence that is not circumstantial—which, in a discrimination case, usually means admissions) and the defendant would do the same with regard to evidence countering an inference of discrimination. The question would then be whether a reasonable jury could infer discrimination if the record at trial were the same as the record on summary judgment (except that some of the evidence given in documentary form in the summary judgment proceedings would have to be given in oral form at a trial). If

so, the defendant's motion for summary judgment would be denied. That is the basis for the reversal of the dismissal of the claim of disability discrimination in this case.

The evidence used to establish a prima facie case under the indirect method would often be part of the circumstantial evidence presented under the direct method. In a case of racial discrimination, for example, the fact that a black employee had been replaced by a white one and the defendant was mum on the reason for the replacement would be some evidence of racial motivation. Another element of the indirect method might be missing—maybe the white had better qualifications and a slightly different kind of job and reported up a different chain of command. But that hole could be plugged by some additional evidence of discrimination, perhaps statistics on the racial composition of the defendant's work force in relation to the pool of potential workers. "Any demonstration strong enough to support a judgment in the plaintiff's favor if the employer remains silent will do, even if the proof does not fit into a set of pigeonholes." *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996) (per curiam).

So it was a mistake for the parties in this case to think that the way to litigate it was to address the two methods of establishing a prima facie case as if each were in its own sealed compartment. One consequence was that the defendant's lawyer made a damaging tactical error by failing to produce any evidence (even a simple sworn denial) of a nondiscriminatory reason for terminating the plaintiff (though he claims to have such evidence), on the ground that the plaintiff had failed to establish a prima facie case by either method taken separately. Maybe so, but the plaintiff presented other evidence of discrimination

besides the defendant's silence on why it had fired the plaintiff, and that silence, though insufficient in itself, was enough (at least given another tactical blunder by the defendant, which I discuss later) to make out a prima facie case when added to the balance. "[W]hen a plaintiff in a discrimination case has direct evidence of discrimination as well as the indirect evidence required to make out a prima facie case under *McDonnell Douglas* he does not have to show that either approach, taken in isolation from the other, makes out a prima facie case—he can combine them." *Simple v. Walgreen Co.*, 511 F.3d 668, 670-71 (7th Cir. 2007); cf. *Logan v. Kautex Textron North America*, 259 F.3d 635, 638-40 (7th Cir. 2001); *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 732 (4th Cir. 1996).

So far I have assumed that *McDonnell Douglas* provides an appropriate method of establishing a prima facie case under the rarely litigated "association" provision of the Americans with Disabilities Act, the provision that forbids discrimination against "a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4); see *Larimer v. International Business Machines Corp.*, 370 F.3d 698 (7th Cir. 2004). As we explained in *Larimer*, and repeated in a slightly different context in *Timmons v. General Motors Corp.*, *supra*, 469 F.3d at 1127-28, an attempt to clone the *McDonnell Douglas* test for use in an association case would enable a plaintiff to establish a prima facie case merely by showing that the employer, knowing that the plaintiff (a qualified worker in the sense of meeting his employer's expectations) had an association with a disabled person, fired the plaintiff or took other adverse employment action against him and replaced him with (or did not take similar

adverse employment action against) someone who did not have a known association with a disabled person. 370 F.3d at 701-02. Yet the inference from these scanty facts that the association had induced the employer's action would be too weak to justify forcing the defendant to produce evidence that he had taken the action for a different, an innocent reason.

Some people do feel distaste for associating with a disabled person. But the employer (and employees whose prejudices the employer might share or condone) are not being asked in an "association" case to associate with a disabled person. He is not another employee, but a stranger to the workplace with whom one of the employees happens to have a relationship. Prejudice against an employee who merely has a relationship with a disabled person doubtless exists; as we pointed out in *Larimer v. International Business Machines Corp.*, *supra*, 370 F.3d at 699-700; see also *Tyndall v. National Education Centers, Inc.*, 31 F.3d 209, 214 (4th Cir. 1994), an employer might worry that the plaintiff would be distracted from his work by the disability of the person with whom he had a relationship, or might think the disease creating the disability catching (perhaps the person is the plaintiff's husband and has AIDS). But that is a sufficiently rare occurrence to require the plaintiff to go beyond a bobtailed *McDonnell Douglas* test and show, as the court in *Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1085 (10th Cir. 1996), put it, that "the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision." See also *Timmons v. General Motors Corp.*, *supra*, 469 F.3d at 1126-27; *Larimer v. International Business Machines Corp.*, *supra*, 370 F.3d at 701; *Hilburn v. Murata Electronics North America, Inc.*,

181 F.3d 1220, 1230-31 (11th Cir. 1999); *Ennis v. National Ass'n of Business & Educational Radio, Inc.*, 53 F.3d 55, 57-59 (4th Cir. 1995). Otherwise the number of spurious suits would soar. An employee who, perhaps fearing the axe, wanted to prepare a discrimination case would have only to talk up at work his relationship to a disabled person; such relationships are not uncommon.

An employer's most likely concern about an employee who has a disabled relative, especially a spouse or child, is that the relative's medical expenses may be covered by the employer's employee health plan. There is a positive correlation between being disabled and having abnormally high medical expenses, just as there is a positive correlation between the age of an employee and his salary because most employees receive regular raises as long as they perform satisfactorily. Suppose a company encounters rough waters and decides to retrench by firing its most expensive employees. They are likely to be older on average than the employees who are retained, but as we said many years ago, and the Supreme Court confirmed in *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611-12 (1993), "nothing in the Age Discrimination in Employment Act forbids an employer to vary employee benefits according to the cost to the employer; and if, because older workers cost more, the result of the employer's economizing efforts is disadvantageous to older workers, that is simply how the cookie crumbles." *Karlen v. City Colleges of Chicago*, 837 F.2d 314, 319 (7th Cir. 1988); see also *EEOC v. Francis W. Parker School*, 41 F.3d 1073, 1076-78 (7th Cir. 1994); *Bramble v. American Postal Workers Union*, 135 F.3d 21, 25-26 (1st Cir. 1998); *Adams v. Florida Power Corp.*, 255 F.3d 1322, 1325-26 (11th Cir. 2001); cf. *Troupe v. May Department Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994).

The majority opinion in this case does not cite any of these precedents or acknowledge the difference between distaste and expense as grounds for a discrimination suit—though the fault for the omission, as we'll see, is the defendant's.

Now it is true, as we know from the discussion in the *Larimer* case of the "expense" form of association discrimination, 370 F.3d at 700-01, that an employer who discriminates against an employee because of the latter's association with a disabled person is liable even if the motivation is purely monetary. But if the disability plays no role in the employer's decision—if he would discriminate against any employee whose spouse or dependent ran up a big medical bill—then there is no *disability* discrimination. It's as if the defendant had simply placed a cap on the medical expenses, for whatever cause incurred, that it would reimburse an employee for. This appears to be such a case. So far as the record reveals, the defendant fired the plaintiff not because her husband was disabled but because his medical expenses—which might not have been any lower had they been due to a condition that did not meet the statutory definition of a disability—were costing the defendant an amount of money that it was unwilling to spend. All the evidence recited in the majority opinion concerns costs ("cutting costs," "high cost of Anthony's medical treatment," "financial albatross," etc.) that a person who had a nondisabling medical condition could equally incur.

If cost was indeed, as appears to be the case, the defendant's only motive for the action complained of, the defendant was not guilty of disability discrimination. *Christian v. St. Anthony Medical Center, Inc.,* 117 F.3d 1051, 1052-53 (7th Cir. 1997). But it has never made this argument, and so reversal is proper. Since, however, a

defendant does not have to file a motion for summary judgment at all, 11 *Moore's Federal Practice*, § 56.32[1], at pp. 56-260 to 56-261 (3d ed. 1997); Fed. R. Civ. P. 56(b), and if he does file one doesn't have to include all his arguments in it, *Smith v. Richert*, 35 F.3d 300, 305 (7th Cir. 1994), the defendant will be able to argue the cost point on remand unless the district judge finds that it has been forfeited by being withheld for so long. The majority opinion in this court need not be an obstacle to the defendant's making the argument. In not remarking the distinction between disability discrimination and expense discrimination, the opinion merely accepts the parties' framing of the issues.