In the

# United States Court of Appeals
### For the Seventh Circuit

No. 11-3767

EUNICE MAGNUS,

*Plaintiff-Appellant*,

*v.*

ST. MARK UNITED METHODIST CHURCH,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:10-cv-00380—**Harry D. Leinenweber**, *Judge.*

ARGUED MAY 31, 2012—DECIDED AUGUST 8, 2012

Before BAUER, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Eunice Magnus brought suit alleging associational discrimination under the American with Disabilities Act (ADA), 42 U.S.C. § 12112(b)(4), among other claims no longer at issue. She asserts that St. Mark United Methodist Church terminated her based on unfounded assumptions concerning her association with her mentally disabled daughter. On summary judgment, the church presented evidence that it

in fact terminated Magnus because of her unsatisfactory work performance and refusal to work weekends. Magnus responded that the church terminated her just two weeks after giving what she calls a "merit-based raise" and just one day after she arrived an hour late to work because of a medical situation with her disabled daughter. She contends that the timing of her termination, coupled with her just-received-merit-based raise, is sufficient to infer associational discrimination. We, like the district court, disagree.

Despite Magnus's contrary assertions, the evidence shows that she received an-across-the-board raise, the same as all other full-time employees, not one based on merit. Further, no evidence suggests that the church was dissatisfied with her one-hour late arrival or believed it would become a problem. And most importantly, the evidence reveals that the church had decided to terminate her employment the weekend before her late arrival. As correctly observed by the district court, Magnus's true complaint is that the church, by mandating she work weekends, failed to accommodate her need to care for her disabled daughter. But unfortunately for Magnus, the ADA does not require employers to reasonably accommodate employees who do not themselves have a disability. As such, Magnus's claim fails as a matter of law.

## I. FACTS

Magnus was initially employed by the church as a receptionist and secretary in 1997 but left in 1998.

Reverend Jon McCoy re-hired her in 2006 to work part-time on the weekends and evenings. Shortly after hiring her in 2006, McCoy became aware that Magnus had a daughter with a disability; Magnus discussed with McCoy problems she was having with her daughter and he consoled her. Magnus worked weekends for the church from 2006 to early 2008. Her daughter at the time was residing in an assisted-living facility. Magnus was allowed to take her daughter home on the weekends; Magnus's son cared for his sister while Magnus was working. Magnus testified that it was her understanding that she could only take her daughter home on weekends.

Magnus accepted a full-time salaried secretary position in February 2008 with a new schedule of Monday through Friday. Her letter of employment stated that the Staff Parish Relations Personnel Committee intended "to establish a Performance Review program for lay staff that will enable the [committee] to recommend future compensation adjustments based on job performance." Nancy Branker, the only other paid secretary, was Magnus's supervisor. She worked Tuesday through Thursday and Saturday and Sunday.

In the spring of 2008, Branker no longer wanted to work every weekend and proposed that she and Magnus alternate weekends. To try and accommodate Branker's request, McCoy asked Magnus on three different occasions if she would work weekend days, but Magnus refused each time, explaining that she took her disabled daughter home on the weekends. (Magnus's son was no

longer available to look after his sister in Magnus's absence.) Julian Valentine, volunteer chairman of the committee, also asked Magnus to work weekends and sent this email to the other committee members after Magnus refused: "I pointed out that this was a non-negotiable request. She accused me of threatening her job security! I've asked Rev. McCoy to write a letter informing Ms. Magnus that she will be required to work a weekend schedule & if she's unable to comply, the church will have to make other arrangements! As much as I personally like Ms. Magnus, it is my opinion that the church will have to find a replacement for her!"

In response to Valentine's email, McCoy proposed a schedule to the committee whereby the secretaries would work an alternating schedule with eight straight days on and four days off. He explained that "while 8 days on and 4 days off may seem difficult, it is the best option for us if there are only two full-time secretaries who are available." He also stated that "[t]he conversation regarding Ms. Magnus' job being threatened is not the primary focus. It was never the intent to make her feel threatened. The larger concern is related to the impact upon Ms. Branker of having her to always have to work every weekend." Deborah Lindsey, a member of the committee, responded, "Not so sure you can work an employee 8 days in a row," and included an explanation of the One Day Rest In Seven Act found on the Illinois Department of Labor website.

McCoy emailed Valentine another proposed schedule to send to the committee members. He stated that

"[a]fter much time and deliberation alone and with the assistance of Ms. Branker and Ms. Magnus the following schedule is proposed . . . [which] will allow two consecutive weekends off and two consecutive weekends 'on.' Unfortunately, it also requires that one set of off days will not be consecutive. Also, this schedule necessitates that the secretaries work seven consecutive days once per [month], if they agree. I realize that Ms. Lindsey noted this scheduling will require the consent of the secretaries (i.e., working seven consecutive days)." Magnus testified that she was never given any proposed schedule, but was instead asked to work weekends in addition to her regular week-day schedule, which she refused to do. Branker suggested to McCoy that the church use volunteers to cover weekends but he rejected this suggestion, explaining that the church has had trouble finding volunteers to work those days and noting security concerns with giving volunteers access to confidential information. Ths issue of weekend scheduling was not again raised with Magnus.

In November, Branker was off work for several weeks due to an illness, requiring Magnus to cover her workload, including finding volunteers to cover shifts. Around this time, McCoy wrote a memo to the committee complaining about Magnus's clerical work deficiencies. McCoy pointed out that Magnus was not entering any information in the daily-report logs, which made it difficult to have a temporary employee help with tasks. He also noted that she needed to improve "(1) Scheduling/ coordinating staff needs for weekend events; (2) operation of the telephone answering machine; and (3) timely

bulletin production." McCoy talked to Magnus about these deficiencies, including her poor phone etiquette. Magnus explained that she was doing the job of four secretaries (the church previously had three to four clerical employees) and was experiencing pressure due to her daughter's disability. McCoy testified that Magnus's unsatisfactory work performance was an on-going issue. Magnus, on the other hand, testified that this was the only time the church complained about her work and she otherwise received accolades for her excellent job performance from McCoy and numerous other church members. Magnus did testify, though, that she was sometimes distracted at work because of her daughter's disability; while at work, Magnus would often take calls from the assisted-living facility to resolve issues arising with her daughter. But she did not miss work because of her daughter and only once took a short time off to care for her ailing mother.

Magnus received a five percent raise at the beginning of January 2009 despite the fact that she never received a formal evaluation for her performance. The church presented evidence that this was an across-the-board, five percent increase to all employees, with the exception of recently-hired part-time employees. McCoy testified that the church had given its employees across-the-board pay increases in previous years and that these were not merit-based, although the church intended to implement a merit-based raise system.

On Sunday, January 25, 2009, Valentine sent an email to the committee members, including McCoy, stating that

committee member Charlotte Newsome "would like to meet at 9am Wed. Jan. 28th, 2009 to discuss the Magnus issue!" Valentine attested that Newsome advised her during a previous phone conversation that she wanted to meet Wednesday morning to discuss the logistics of firing Magnus, including how to inform Magnus of the decision, who should be there, and whether security should be present. On January 27, Magnus called and informed Branker that she would be an hour late due to a medical situation concerning her disabled daughter. When Magnus arrived at work she informed McCoy why she was late and told him she would come to work one hour early the next day. McCoy said that was ok. The church terminated Magnus's employment the next day and gave her a letter signed by McCoy and Valentine that stated, "[a]s a result of your continued poor job performance, despite several suggestions regarding improvement strategies, your employment at St. Mark . . . is terminated, effective immediately." Although not communicated to Magnus, McCoy testified that the decision was also due to her refusal to work weekends.

## II. ANALYSIS

Magnus brings this associational discrimination claim under the ADA, 42 U.S.C. § 12112(b)(4), contending that she was fired for her inability to work weekends and for arriving late on January 27, both due to her disabled daughter. She further asserts that the weekend schedule violated state and federal law, and thus, could not consti-

tute a legitimate reason to terminate her employment and that her performance was otherwise satisfactory. As such, she claims the reasons given for her termination were pretextual.

The district court entered summary judgment in favor of the church. Our review is de novo. *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We construe all facts and reasonable inferences in the light most favorable to Magnus. *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010).

Under 42 U.S.C. § 12112(b)(4), an employer is prohibited from discriminating against an employee "because of the known disability of an individual with whom [the employee] is known to have a relationship or association." *See also* 29 C.F.R. § 1630.8. Associational discrimination claims are unlike those otherwise falling under the ADA because employers are not required to provide reasonable accommodations to non-disabled workers. *See Larimer v. Int'l Bus. Mach. Corp.*, 370 F.3d 698, 700 (7th Cir. 2004); *see also* 29 C.F.R. Pt. 1630, App. (§ 1630.8) ("[A]n employer need not provide . . . [an] employee without a disability with a reasonable accommodation because that duty only applies to qualified . . . employees with disabilities."). Thus, an employee who cannot meet the attendance requirements of her job is not protected by § 12112(b)(4).

In our seminal case on this issue, we outlined three categories into which "association discrimination" plain-

tiffs generally fall: expense, disability by association, and distraction. Magnus has brought a claim under the distraction category. *Larimer*, 370 F.3d at 700. This theory contemplates a scenario, for example, where an employee is fired because she is a bit inattentive on the job due to her child's or spouse's disability that requires her attention, but not so inattentive that she needs an accommodation to perform to her employer's satisfaction. *See id.* We have endorsed a modified *McDonnell Douglas* test for claims under this section of the ADA, stating that a plaintiff can prove her case by establishing: (1) she was qualified for the job at the time of the adverse employment action; (2) she was subjected to an adverse employment action; (3) she was known by her employer at the time to have a relative or associate with a disability; and (4) her case falls into one of the three relevant categories of expense, distraction, or association. *Id.* at 701-02.

In a slightly different context, we noted that this modified *McDonnell Douglas* test and the direct method can often be analyzed together because "[b]oth approaches require the plaintiff to present evidence indicating it is more likely than not the employer took the adverse action because of the plaintiff's disability," *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1127 (7th Cir. 2006)—or as more accurately stated for this case, because of the plaintiff's association with a disabled individual, *see Dewitt v. Proctor Hosp.*, 517 F.3d 944, 952 (7th Cir. 2008) (Posner, J., concurring) (indicating that a plaintiff must demonstrate that "the adverse employment action occurred under circumstances raising a reasonable infer-

ence that the disability of the relative or associate was a determining factor in the employer's decision."). This is where Magnus's claim falters.

Although an employer does not have to accommodate an employee because of her association with a disabled person, the employer cannot terminate the employee for unfounded assumptions about the need to care for a disabled person. *See Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 511 (3d Cir. 2009); *see also Tyndall v. Nat'l Educ. Ctr.*, 31 F.3d 209, 214 (4th Cir. 1994) (noting that although termination based on assumptions regarding future absences related to a relative's care may give rise to liability, termination resulting from an employee's past absences and clear indication of future absences does not). The legislative history accompanying this section, H.R. Rep. No. 101-485, at 61-62, reprinted in 1990 U.S.C.C.A.N. 303, 343-44, explains:

> [A]ssume, for example that an applicant applies for a job and discloses to the employer that his or her spouse has a disability. The employer believes the applicant is qualified for the job. The employer, however, assuming without foundation that the applicant will have to miss work or frequently leave work early or both, in order to care for his or her spouse, declines to hire the individual for such reasons. Such a refusal is prohibited by this subparagraph.
>
> In contrast, assume that the employer hires the applicant. If he or she violates a neutral employer policy concerning attendance or tardiness, he or

she may be dismissed even if the reason for the absence or tardiness is to care for the spouse. The employer need not provide any accommodation to the nondisabled employee.

*See also* 29 C.F.R. Pt. 1630, App. (§ 1630.8) (stating that an employer may not make decisions based on the "belie[f] that the [employee] would have to miss work or frequently leave work early" in order to take care of a disabled person).

We can quickly dispose of Magnus's argument that she was improperly terminated in violation of state and federal law because she was asked to work seven straight days without overtime pay. Magnus has not brought suit under either Illinois's One Day Rest in Seven Act, 820 ILCS 140/2, or the Fair Labor Standards Act, 29 U.S.C. § 207, 215(a). As such, and as the district court correctly observed, "[t]his is . . . not a case about wage and hour violations." *Magnus v. St. Mark*, No. 1:10-cv-00380, 2011 WL 5515521, at *5 (N.D. Ill. Nov. 10, 2011). Magnus's claim on appeal is association discrimination under the ADA and therefore, to succeed, she must present evidence that her daughter's disability was a determining factor in the church's termination decision. The church's reason for taking the adverse action must be based on a discriminatory intent. *Stockwell v. City of Harvey*, 597 F.3d 895, 901-02 (7th Cir. 2010).

To support her claim under the ADA, Magnus relies heavily on the timing of her termination; she was terminated just one day after arriving late to work because she needed to tend to her daughter. Although temporal

proximity can serve as an important evidentiary ally of the plaintiff, *see Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 674-75 (7th Cir. 2011), it rarely is alone sufficient to create a triable issue on causation, *Milligan v. Bd. of Tr. of S. Ill. Univ.*, No. 10-3862, 2012 WL 2764971, at *10 (7th Cir. July 10, 2012). "Under ordinary circumstances, close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment *provided that* there is other evidence that supports the inference of a causal link." *Id.* (emphasis added) (quotations omitted). We have "underscored the importance of context in assessing whether an inference of causality is warranted." *Davis*, 651 F.3d at 675. The context here does not justify such an inference.

The decision to terminate Magnus was made the weekend before her one-hour-late arrival. Although Magnus disputes this, she presented no evidence supporting a competing reasonable inference. Further, no evidence suggests that the church was displeased with Magnus's late arrival. Magnus offered to make up the time the next day and the record reveals that she had a solid work attendance, including arriving on time for her shifts and often staying late to complete assignments. Magnus also presented no evidence that the church had unfounded assumptions that her one-hour-late arrival was the start of a pattern.

The church provided legitimate, non-discriminatory reasons for its actions. Magnus had been counseled just two months prior to her termination for her unsatisfactory work performance. Even if her unsatisfactory work per-

formance was in part due to distractions caused by her disabled daughter, as explained, the church was not required to provide Magnus with an accommodation to enable her to perform her job to the church's satisfaction. *See Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 480 (6th Cir. 2011) (even if employee's poor work performance was due to wife's illness, it's irrelevant because the employee was not entitled to a reasonable accommodation). Further, the church knew that Magnus had a daughter with a disability before it promoted her to a full-time position. It also knew that her daughter's disability was at times distracting and upsetting for Magnus, yet, the church still promoted her, undercutting an inference that she was terminated based on unfounded fears that her daughter's disability would adversely affect her work. *See Blasdel v. Nw. Univ.*, No. 11-2085, 2012 WL 2927763, at *6 (7th Cir. July 19, 2012); *see also Stansberry*, 651 F.3d at 488.

Although Magnus received praise from McCoy after he counseled her, nothing in the record shows that Magnus corrected the specific performance deficiencies he had previously noted. Further, it matters not that McCoy's evaluation may have been wrong, what matters is whether he honestly believed that Magnus's performance was deficient. *See Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 919-20 (7th Cir. 1996). "[W]e do not sit as a kind of 'super-personnel department' weighing the prudence of employment decisions made by firms charged with employment discrimination." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001) (quotations omitted).

Magnus points out that she received a raise just two weeks before her termination. *See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459, 1461 (7th Cir. 1994) (concluding that a raise, along with suspicious timing of termination, created an inference of retaliation.) The church, however, presented evidence that this was an across-the-board, five percent increase to all employees, with the exception of recently-hired part-time employees, and was not merit-based. Similar raises had been given in previous years. Magnus's argument that this was actually a merit-based raise stems from her employment offer letter, which said the church intended to establish a review program for determining pay raises based on job performance. The record is undisputed, though, that the church had not yet established any performance review program.

Both parties further agree that Magnus's unwillingness to work weekends was a contributing and possibly primary reason for her termination. Although Magnus argues that requiring her to work weekends in addition to her normal schedule violated wage and hour laws, she has not shown that this reason was a lie to cover up for associational discrimination. *See Koski v. Standex Int'l Corp.*, 307 F.3d 672, 677 (7th Cir. 2002); *see also Erdman*, 582 F.3d at 510 n.6 (noting that although the reason for termination did not violate the ADA, it may have violated the FMLA). The church asked Magnus to rotate her schedule with the other full-time secretary so that neither had to work a disproportionate number of weekend days. This supports a conclusion that the church was not discriminating against Magnus but

simply treating her like her comparator. Magnus was not entitled to special consideration.

We agree with the district court that "it is . . . difficult to escape the conclusion that the crux of this case remains Magnus' belief that she should not be made to work on weekends when she needs to care for her daughter." 2011 WL 5515521 at *4. Unfortunately for Magnus, despite the fact that the church may have placed her in a difficult situation considering her commendable commitment to care for her disabled daughter, she was not entitled to an accommodated schedule. *See Tyndall,* 31 F.3d at 214. "[T]he association provision does not obligate employers to accommodate the schedule of an employee with a disabled relative." *Erdman*, 582 F.3d at 510; *see also* 29 C.F.R. Pt. 1630, App. (§ 1630.8) (employees are not entitled to modified work schedules to enable them to care for disabled family members).

## III. CONCLUSION

For the reasons stated, we Affirm the district court's grant of summary judgment in favor of the church and against Magnus.