In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-3356

FRANK PIERRI,

*Plaintiff-Appellant,*

*v.*

MEDLINE INDUSTRIES, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17 C 9037 — **Robert W. Gettleman**, *Judge.*

ARGUED MAY 18, 2020 — DECIDED AUGUST 6, 2020

Before WOOD, BARRETT, and SCUDDER, *Circuit Judges.*

WOOD, *Circuit Judge.* Frank Pierri was a chemist for Medline Industries. Initially, he did well at the company, but problems arose after he asked for accommodations to enable him to take care of his ailing grandfather. Medline was receptive, and it ultimately gave him limited time off for this purpose under the Family and Medical Leave Act (FMLA). Pierri asserts that his supervisor then became so hostile to him that he needed personal time off because of the stress. He left on

FMLA leave and never returned. Medline eventually termi-
nated his employment, causing Pierri to sue the company.
The district court granted summary judgment for Medline,
and we affirm.

**I**

Because we are reviewing a ruling on summary judgment,
we take the facts in the light most favorable to Pierri, without
vouching further for them. Our account should be under-
stood in this light. See *Knopick v. Jayco, Inc.*, 895 F.3d 525, 527
(7th Cir. 2018).

Pierri began working for Medline in 2011. During the first
four years of his tenure at the company, Pierri earned several
promotions and received consistently positive performance
evaluations. Everything went well until 2015, when Pierri's
grandfather fell ill with liver cancer. Pierri asked Rich Tyler,
his supervisor, if he could work ten-hour shifts four days a
week instead of the eight-hour shifts five days a week that he
had been covering. Pierri explained that he needed the altered
schedule in order to care for his ailing grandfather. Tyler
agreed and made the change. Six months later, however, Ty-
ler told Pierri that his work performance had suffered and
that he would have to return to the normal five-day, eight-
hour shifts. Pierri protested that he needed at least one week-
day off to take his grandfather on his weekly trips to the hos-
pital. Tyler offered to let Pierri work Tuesday through Satur-
day, but Pierri declined this accommodation because he
wanted to attend school on Saturdays. Pierri then discussed
his options with Medline's Human Resources (HR) Depart-
ment and learned that he could care for his grandfather using
leave under the Family and Medical Leave Act (FMLA). Med-
line approved Pierri for one day of leave each week.

After Pierri began working under the new schedule, Tyler began harassing him. Tyler belittled him in front of co-workers, demanded to know minutiae of Pierri's day-to-day schedule, and refused to assign him research and development work, on which Pierri's bonus primarily depended.

Pierri filed several complaints with Medline's HR department, but the harassment continued and began to take a toll on him. Citing stress and anxiety, Pierri asked for full-time FMLA leave. Medline granted his request effective March 30, 2016 and kept him on that status through the end of September 2016. It then approved him for short-term, and then long-term, disability leave. Nearly a year after his leave had begun, on March 28, 2017, Medline contacted Pierri's attorney to find out whether he planned on returning; it warned the attorney that if it did not hear from Pierri by the end of the week, he would lose his job. Pierri did not contact the company, and so at the end of two weeks, Medline terminated his employment.

Meanwhile, on March 28, 2016, Pierri filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), alleging that Medline had discriminated against him based on his grandfather's disability and had retaliated against him for complaining to HR. He received a right-to-sue letter on September 27, 2017, and he filed a *pro se* complaint with the court on December 15, 2017. He later filed an amended complaint through counsel.

Pierri raised two counts against Medline. First, he contended that Medline had discriminated against him in violation of the Americans with Disabilities Act (ADA), see 42 U.S.C. § 12112(b)(4), for his association with his ailing grandfather. Second, he argued that Tyler retaliated against him for complaining to HR and for filing a complaint with the

EEOC, see 42 U.S.C. § 12203. The district court granted summary judgment to Medline on both counts. Pierri appeals, and we now affirm.

## II

The ADA prohibits an employer from discriminating against an employee "because of the known disability of an individual with whom [the employee] is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). Pierri asserts that Medline, through Tyler, discriminated against him because of his association with his grandfather.

In *Larimer v. Int'l Bus. Mach. Corp.*, 370 F.3d 698 (7th Cir. 2004), we identified three situations in which a plaintiff may bring a claim of associational discrimination. The "expense" variant arises when an employee's "[relative] has a disability that is costly to the employer because the [relative] is covered by the company's health plan." *Id.* at 700; see also *Dewitt v. Proctor Hosp.*, 517 F.3d 944, 947–49 (7th Cir. 2008) (denying summary judgment to an employer on a claim that plaintiff was fired in order to avoid continuing to pay for her husband's medical expenses under its health insurance plan). The second, "disability by association," occurs when an employer fears that the employee may have become infected with a disease because of the known disease of an associate of the employee. *Larimer*, 370 F.3d at 700. The third, "distraction," arises when "the employee is somewhat inattentive at work because his spouse or child has a disability that requires his attention, yet not so inattentive that to perform to his employer's satisfaction he would need an accommodation." *Id.*

Pierri cursorily argues that his is a "distraction" situation. But there is no evidence in the record to support this. Pierri

has not argued or presented any evidence that he was distracted at work. Indeed, the evidence indicates that Pierri put forward a strong performance on the job until he was switched to a four-day schedule to accommodate his need to care for his grandfather. Pierri has not pointed to any evidence that he was distracted, that Medline regarded him as distracted, or that Medline took any action against him in retaliation for any real or imagined distraction.

We should note at this juncture that the three situations we identified in *Larimer* were not meant to be exhaustive. That said, Pierri has no theory of associational discrimination that he has supported with any evidence. The record shows that Medline made ample efforts to accommodate Pierri's need to care for his grandfather. It first permitted him to work a four-day workweek, asking him to return to a five-day schedule only after his performance deteriorated. Even then, it offered him the opportunity to work Tuesday through Saturday so that he could take his grandfather to the hospital on Mondays, an offer which Pierri declined for reasons unrelated to his need to care for his grandfather. Thus, Pierri has failed to put forward a *prima facie* case of associational discrimination under the ADA. *Cf. Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 336 (7th Cir. 2012) ("[A]n employee who cannot meet the attendance requirements of [his] job is not protected by § 12112(b)(4).").

Even if Pierri could show some form of associational discrimination, summary judgment in Medline's favor would still be warranted because Pierri failed to show that he suffered any adverse employment action. Most of Pierri's complaints concern Tyler's general rudeness toward him. He alleges, for instance, that Tyler brusquely told him not to

interrupt while Tyler was having a conversation with another employee and that Tyler threatened to report him when he asked to leave work. Pierri also complains that Tyler gave him an "average" rating on his performance evaluation when he should have received a rating of "above average." None of these complaints describes an adverse employment action. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 466 (7th Cir. 2002) ("Negative evaluations, standing alone, do not constitute adverse employment actions."); *Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010) ("[U]nfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions.").

While Pierri's bonus was affected by these events, that too did not amount to an adverse employment action. Pierri admits that he received his bonus for the first quarter of 2016, although he alleges that he had to complain to get it. He received $750 for his R&D work that quarter. Medline capped R&D bonuses at $3,000 per year, and so Pierri was right on track, receiving one-quarter of the maximum annual bonus for the one quarter of the year he worked. Pierri would have had the opportunity to earn the maximum R&D bonus for the remaining three quarters of 2016 had he continued to work. He did not earn the bonus for the simple reason that he completely stopped working, not because of any effort by Tyler (or anyone else at Medline) to deprive him of R&D work. See *Rabinovitz v. Pena*, 89 F.3d 482, 488–89 (7th Cir. 1996) ("[L]oss of a bonus is not an adverse employment action in a case … where the employee is not automatically entitled to the bonus."). Although Tyler's actions may have had the potential to cost Pierri his bonus at some later time, they did not cost him anything during the period he actually worked. This

hypothetical loss of potential future bonuses does not constitute an adverse employment action.

Pierri also points to a change in his mix of work assignments as evidence of discrimination. The record shows, he contends, that Tyler systematically assigned him less and less R&D work and more work conducting fiber testing. This was a demeaning shift, Pierri says, because fiber testing was typically done by less qualified junior technicians. Cases such as *Collins v. State of Illinois*, 830 F.2d 692, 702–04 (7th Cir. 1987), *Dahm v. Flynn*, 60 F.3d 253, 257 (7th Cir. 1994), and *Tart v. Illinois Power Co.*, 366 F.3d 461, 473–74 (7th Cir. 2004), all demonstrate that such a *de facto* demotion can be an adverse employment action for purposes of the ADA.

That is indeed what those cases hold, but they each involved a wholesale change in duties, not a simple shift in the balance of job responsibilities. Although we accept that Pierri was doing more fiber testing and less R&D, the facts show that he remained in the same job position, in the same department, and at the same desk. Moreover, the fiber-testing work was not performed exclusively by the lower-level junior technicians; Pierri himself had performed just such work before he asked for the accommodations to help him care for his grandfather, and fiber testing was one quality-control measure the company took. Finally, although Pierri states that R&D was 95% of a chemist's work and that fiber testing did not require a degree in chemistry, he does not support that assertion with any evidence in the record.

The district court thus correctly granted summary judgment in favor of Medline on Pierri's associational discrimination claim. Pierri failed to present material facts in dispute that would show that Medline discriminated against him for

his association with his grandfather or that he suffered an adverse employment action.

## III

Pierri's retaliation claim fares no better. A plaintiff may show retaliation either directly or indirectly. In order to make out a case of retaliation a plaintiff must show that: 1) he engaged in statutorily protected activity; 2) he suffered an adverse action; and 3) there was a causal link between the two. *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1106 (7th Cir. 2012). One way to show that causal link is through evidence that "a similarly situated employee who did not engage in the statutorily protected activity received better treatment." *Id*. That is not essential, however; the critical point is to offer evidence that would allow the factfinder to conclude that the employer took the adverse action because of the protected activity.

For the reasons discussed above, Pierri has not shown that he suffered an adverse employment action as a result of his internal complaints to Medline. In this court, he also argues that Medline fired him in retaliation for his complaint to the EEOC. The latter theory, however, is unavailable to him at this point, because he failed to include it in his original complaint to the EEOC, he made no effort ever to amend his EEOC charge, and he never filed a new charge after he lost his job. His failure to include this allegation in his charge to the EEOC forecloses his ability to pursue it in the courts.

We add that his failure properly to exhaust his remedies before the EEOC is not his only problem with this theory. On the record assembled at the summary judgment stage, no reasonable jury could find that Medline ended his employment

in retaliation for his complaints, whether to HR or to the EEOC. It is undisputed that after Pierri had taken a full year of leave and a year after the EEOC complaint, Medline contacted him and informed him that he would be fired if he did not provide notice of his intention to return to work within two weeks. Pierri never responded. The only possible conclusion is that it was his failure to respond that led to his termination, not retaliation for his complaints. The district court thus was also correct to grant summary judgment to Medline on Pierri's retaliation theory.

## IV

We AFFIRM the judgment of the district court.