Filed 8/29/16; on rehearing

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LUIS CASTRO-RAMIREZ, | B261165, B262524 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC511197) |
| v. | |
| DEPENDABLE HIGHWAY EXPRESS, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment and an order of the Superior Court for the County of Los Angeles, Richard Fruin, Judge.  B261165 judgment reversed; B262524 order reversed.

Employees' Legal Advocates and A. Jacob Nalbandyan for Plaintiff and Appellant.

Gordon & Rees, Don Willenburg, Mark S. Posard and Jennifer M. Lynch for Defendant and Respondent.

\* \* \* \* \* \*

Plaintiff Luis Castro-Ramirez sued his former employer, Dependable Highway Express, Inc. (DHE), alleging causes of action for disability discrimination, failure to prevent discrimination, and retaliation under the Fair Employment and Housing Act (FEHA or the Act) (Gov. Code, § 12900 et seq.), as well as wrongful termination in violation of public policy. (He alleged other claims not pursued on appeal.) Plaintiff's son requires daily dialysis, and according to the evidence, plaintiff must be the one to administer the dialysis. For several years, plaintiff's supervisors scheduled him so that he could be home at night for his son's dialysis. That schedule changed when a new supervisor took over and ultimately terminated plaintiff for refusing to work a shift that did not permit him to be home in time for his son's dialysis. The trial court granted defendant's motion for summary judgment and denied plaintiff's motion to tax costs.

We reverse the judgment and the order denying the motion to tax costs. Plaintiff has demonstrated triable issues of material fact on his causes of action for associational disability discrimination, failure to prevent discrimination, retaliation, and wrongful termination in violation of public policy.

**FACTS AND PROCEDURE**

*1. The Complaint*

Plaintiff alleged that, when DHE hired him to work as a truck driver in 2010, he told DHE he had a disabled son who required dialysis on a daily basis and he (plaintiff) was responsible for administering the dialysis. He requested work schedule accommodations that his supervisor initially granted, permitting him to attend to his son in the evening. In 2013, a new supervisor changed his work schedule. Plaintiff complained to the new supervisor about the change in schedule. On April 23, 2013, the supervisor gave plaintiff the 12:00 p.m. shift. Plaintiff objected and explained that the shift would not allow him to be home early enough in the evening to tend to his disabled son. The supervisor spoke to a manager and then terminated plaintiff's employment. The supervisor told plaintiff he "had quit by choosing not to take the assigned shift."

Plaintiff's complaint alleged a cause of action for associational disability discrimination in violation of FEHA, claiming defendant "was substantially motivated, in

2

part, to terminate Plaintiff because of his association with his disabled family members . . . ." Plaintiff also alleged DHE's conduct was in retaliation for his assertion of rights under FEHA. Plaintiff alleged several other causes of action, including failure to take reasonable steps to prevent the unlawful discrimination, and wrongful termination in violation of public policy.

## 2. *DHE's Motion for Summary Judgment*

The pertinent facts reflected in the parties' summary judgment papers are as follows. DHE employed plaintiff at will. DHE hired plaintiff in December 2009 to work out of its Los Angeles terminal as a local driver. During his time with DHE, he drove different routes throughout Los Angeles County.

Plaintiff's son needs a kidney transplant and has required daily home dialysis treatments for the last 15 years. Plaintiff is the only person in his household who knows how to operate the dialysis machine for his son. One has to take classes to learn how to operate the machine.

When plaintiff first began work at DHE, he informed the recruiting manager who hired him that he had daily obligations at home related to administering dialysis to his son. Plaintiff reported to Armando Gomez and Winston Bermudez, who were his initial supervisors, for over three years. Bermudez became his supervisor in 2011, when Bermudez was promoted to the dispatcher position. When Bermudez became his supervisor, plaintiff told Bermudez that he had a disabled son to whom he needed to apply daily dialysis. He also told Bermudez he needed to end his shifts early enough to get home for his son's treatments. Bermudez met plaintiff's needs as often as he could by giving him a shift that enabled him to care for his son. Bermudez never gave plaintiff a shift that began as late as noon. Gomez also knew about plaintiff's special need to go home early to care for his son and informed Bermudez of this when Bermudez first became a dispatcher. Thus, while the schedules of DHE's drivers varied from day to day, plaintiff's typical schedule was from 9:00 or 10:00 a.m. until 7:00 or 8:00 p.m. There were times, however, when plaintiff worked shifts ending later, such as after 10:00 or 11:00 p.m.

3

Plaintiff's ability to work later depended on his son's condition on any given day. The amount of time his son needed to be connected to the machine varied between 10 and 12 hours. The time at which plaintiff would need to start administering dialysis also varied from between 7:00 p.m. and 12:00 a.m. There was no "normal day," beyond these general guidelines. On days when his son would need to be connected on the earlier side, plaintiff would communicate this to Gomez or Bermudez.

Throughout his employment, plaintiff performed satisfactorily with no problems. Plaintiff loved his job and appreciated DHE's assistance "from the heart." That assistance changed, however, when Bermudez was no longer his supervisor.

Sometime in March 2013, DHE promoted Bermudez to operations manager and Boldomero Munoz-Guillen (known as Junior) became plaintiff's supervisor (and Bermudez supervised Junior). When this happened, Bermudez told Junior that plaintiff had special needs related to his disabled son and needed to leave early. Bermudez asked Junior to "work with" plaintiff.

At some point later in March 2013, plaintiff complained to Bermudez that Junior had changed his hours, and he was starting later and finishing later and was unable to leave to tend to his son. Bermudez told Junior that plaintiff was complaining about his changing hours and his need to leave early. Junior told Bermudez that he did not need to bring plaintiff in earlier at the time, but Junior indicated he would "work on that." Bermudez never reported plaintiff's special needs to human resources and did not monitor plaintiff's schedule after plaintiff complained to him about Junior.

On April 15, 2013, approximately a week before plaintiff's termination, one of DHE's customers sent an e-mail to Bermudez and another manager (not Junior) asking for plaintiff, the "regular drive[r]," to do the customer's deliveries at 7:00 a.m. The customer stated that it "ha[d] always been done like that until recently." When plaintiff asked Junior about deliveries to this customer, Junior told him that the customer did not want plaintiff to make those deliveries and did not like plaintiff's work, and that was why Junior had given him shifts starting later. A few days later, the customer called plaintiff directly. The customer asked plaintiff why he was not making deliveries. Plaintiff

4

explained that Junior had said the customer did not like his work. The customer told plaintiff that was untrue and gave him a copy of the e-mail specifically requesting plaintiff's services. When deposed, Junior testified that he had seen the e-mail from the customer, but he could not recall exactly when.

On April 22, 2013, Junior assigned plaintiff a shift that started at 11:55 a.m., the latest he had ever started a shift, and ended at 9:04 p.m. He had "no problem" with the route that day because it still allowed him to be home in time for his son's dialysis. But he told Junior: "Please, I need to have my job like always. I've always had help from everyone except you."

The following day, on April 23, 2013, Junior assigned plaintiff a shift beginning at 12:00 p.m. Unlike the previous day, this assignment was for a route from Los Angeles to Oxnard and back, including multiple pickups and deliveries. Plaintiff explained to Junior that it was too late in the day for him to drive that route because he could not get back in time to administer dialysis to his son by 8:00 p.m. Plaintiff requested another route or simply to take that day off. He also reminded Junior that Bermudez had already talked to Junior about plaintiff's need for shifts enabling him to leave early for his son.

When plaintiff complained to Junior, Junior laughed and said, "Winston [Bermudez] doesn't work here anymore. Now it's me." Junior told plaintiff that, if he did not do the route, he was fired. Plaintiff said he was sorry, but he could not do it. Junior told him to return the next day to sign the termination paperwork.

Plaintiff returned to DHE for three consecutive days after that because he wanted to work. On the third day, another manager told him that he had not worked for three days and "of course" he was terminated. DHE processed the termination as a "[v]oluntary [t]ermination" or "[r]esignation," with the stated reason being "[r]efused assignment." Plaintiff refused to sign the document stating he had resigned.

On the day Junior terminated plaintiff, Junior scheduled at least eight other drivers to start shifts well before noon, with start times at 4:54 a.m., 5:54 a.m., 7:00 a.m., 7:54 a.m., 8:06 a.m., 8:54 a.m., 9:00 a.m., and 10:54 a.m.

5

Maria Ramirez, DHE's human resources manager, testified: "It is not uncommon for drivers at [DHE] to refuse work assignments for a variety of reasons; if one of its drivers refuses a work assignment for any reason, this is grounds for termination." DHE's employee handbook states refusal to obey a supervisor's order or refusal to perform a job assignment is grounds for disciplinary action, including suspension without pay, discharge, counseling, and warning notices.

### 3. *The Trial Court's Rulings*

The trial court granted DHE's motion for summary judgment, concluding that there was no triable issue of material fact on any cause of action. The court rejected plaintiff's theory that DHE violated FEHA by terminating him for requesting an accommodation to care for a relative with a disability. The court concluded plaintiff's evidence at best showed that Junior was unwilling to provide accommodation to the same extent as plaintiff's previous supervisor. The court found no evidence to show the termination decision was based on plaintiff's association with his child, or in retaliation for his scheduling requests. Even assuming plaintiff could make a prima facie case, the court found inadequate evidence that defendant's stated reason for termination was pretextual. Plaintiff could not show the assignment he refused was improperly motivated, because plaintiff worked nearly identical hours the previous day without objection.

The court entered judgment for DHE and entered an amended judgment of dismissal several weeks later, awarding statutory costs to DHE in the amount of $7,592.08. Still later, on January 8, 2015, the trial court denied plaintiff's motion to tax or strike DHE's costs, rejecting plaintiff's argument that an employer is not entitled to costs in a FEHA action.

Plaintiff appealed from the judgment and the subsequent order denying his motion to tax costs. We consolidated the appeals for purposes of briefing, oral argument, and decision.

### STANDARD OF REVIEW

We review an order granting summary judgment de novo, "considering all the evidence set forth in the moving and opposition papers except that to which objections

6

have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).)

A defendant moving for summary judgment must show "that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action." (Code Civ. Proc., § 437c, subd. (p)(2).) "In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [his or] her evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.) We accept as true both the facts shown by the losing party's evidence and reasonable inferences from that evidence. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 856; *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 148.)

Summary judgment is appropriate only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A triable issue of material fact exists if the evidence and inferences therefrom would allow a reasonable juror to find the underlying fact in favor of the party opposing summary judgment. (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at pp. 850, 856.)

**DISCUSSION**

*1. Associational Disability Discrimination*

FEHA provides a cause of action for associational disability discrimination, although it is a seldom-litigated cause of action. (*Rope v. Auto-Chlor System of Washington, Inc.* (2013) 220 Cal.App.4th 635, 656-657 (*Rope*), superseded by statute on another ground.) As to disability discrimination generally, FEHA makes it unlawful for an employer, "because of the . . . physical disability . . . of any person, . . . to discharge the person from employment . . . or to discriminate against the person . . . in terms,

conditions, or privileges of employment." (Gov. Code, § 12940, subd. (a).)[1] The very definition of a "physical disability" embraces association with a physically disabled person. FEHA explains that the phrase "'physical disability' . . . includes a perception . . . that the person is associated with a person who has, or is perceived to have" a physical disability. (§ 12926, subd. (*o*).)[2] Accordingly, when FEHA forbids discrimination based on a disability, it also forbids discrimination based on a person's association with another who has a disability.

A prima facie case of disability discrimination under FEHA requires a showing that (1) the plaintiff suffered from a disability, (2) the plaintiff was otherwise qualified to do his or her job, with or without reasonable accommodation, and (3) the plaintiff was subjected to adverse employment action because of the disability. (*Green v. State of California* (2007) 42 Cal.4th 254, 262 (*Green*); see *Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 378-379; *Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 255 (*Jensen*).) Adapting this framework to the associational discrimination context, the "disability" from which the plaintiff suffers is his or her association with a disabled person. Respecting the third element, the disability must be a substantial factor motivating the employer's adverse employment action. (Cal. Code Regs., tit. 2, § 11009, subd. (c); *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 229, 232; *Rope, supra*, 220 Cal.App.4th at p. 658.)

Once the plaintiff establishes a prima facie case, "the burden then shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse employment action." (*Deschene v. Pinole Point Steel Co.* (1999) 76 Cal.App.4th 33, 44.) The

---

[1]     Further undesignated statutory references are to the Government Code.

[2]     The complete text states: "As used in [FEHA] in connection with unlawful practices, unless a different meaning clearly appears from the context: [¶] . . . [¶] (*o*) 'Race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, age, sexual orientation, or military and veteran status' includes a perception that the person has any of those characteristics or that the person is associated with a person who has, or is perceived to have, any of those characteristics." (§ 12926, subd. (*o*).)

8

plaintiff may then show the employer's proffered reason is pretextual (*Rope, supra*, 220 Cal.App.4th at p. 656) or offer any further evidence of discriminatory motive. (*Guz, supra*, 24 Cal.4th at p. 356.) "In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias." (*Ibid.*)

Here, DHE challenges plaintiff's case on several grounds. First, it argues that plaintiff's "entire case hinges on his fervent belief that [DHE] had an obligation to provide him with a special schedule as an accommodation for his son's illness," but it contends DHE had no such duty. Second, DHE argues that, as a matter of law, plaintiff cannot establish his association with his disabled son motivated his termination, and moreover he cannot show that DHE's legitimate, nondiscriminatory reason for terminating him was pretextual. As we shall explain, none of these arguments entitle DHE to summary judgment.

### a. Plaintiff's Associational Disability Discrimination Cause of Action Survives His Abandonment of His Failure to Accommodate Cause of Action

DHE maintains that fundamentally this is a reasonable accommodation case, and argues that FEHA is "clear" that employers need not make accommodations for associates of the disabled—that is, only employees who are themselves disabled are entitled to reasonable accommodations. For his part, plaintiff tells us he has abandoned the reasonable accommodation cause of action and is not challenging the court's ruling on it. We agree that the trial court's ruling on the failure to accommodate cause of action is not at issue on appeal, and we do not decide whether FEHA establishes a separate duty to reasonably accommodate employees who associate with a disabled person.

To us, the proper inquiry is: Even if DHE had no separate duty under FEHA to provide plaintiff with reasonable accommodations for his son's illness, was there sufficient evidence that discriminatory animus motivated Junior's refusal to honor plaintiff's scheduling request and his termination of plaintiff? We address that point in part 1.b., *post*. We pause here to point out that plaintiff's abandonment of his failure to accommodate cause of action does not in itself mean he may not pursue his claim that he

9

suffered discrimination based on associational disability. Nor does his decision to not pursue a failure to accommodate mean that associational disability is no longer part of this case.

In its respondent's brief, DHE implicitly acknowledges that the abandonment of the accommodation cause of action does not sound the death knell to the discrimination cause of action because DHE proceeds to argue that there is no triable issue of fact either of motive or pretext for plaintiff to establish discrimination. Even so, we find accommodation relevant as to plaintiff's discrimination cause of action. We first observe that no published California case has determined whether employers have a duty under FEHA to provide reasonable accommodations to an applicant or employee who is associated with a disabled person. We acknowledge that the reasonable accommodation subdivision of section 12940 does not expressly refer to persons other than an applicant or employee. The pertinent language makes it an unlawful employment practice "[f]or an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." (§ 12940, subd. (m)(1).) But we do not read subdivision (m)(1) in isolation; instead we read parts of a statutory scheme together and construe them in a manner that gives effect to each. (*City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462, 468.) And under section 12926, subdivision (*o*), "'physical disability' . . . includes a perception" that a person "is associated with a person who has, or is perceived to have," a physical disability. In other words, association with a physically disabled person appears to be itself a disability under FEHA. Like the many other definitions set forth in section 12926, this definition of a physical disability applies "in connection with unlawful practices [under FEHA], unless a different meaning clearly appears from the context." (§ 12926.) Accordingly, when section 12940, subdivision (m) requires employers to reasonably accommodate "the known physical . . . disability of an applicant or employee," read in conjunction with other relevant provisions, subdivision (m) may reasonably be interpreted to require accommodation based on the employee's association with a physically disabled person. Again, given plaintiff's concession, we do not decide

10

this point. We only observe that the accommodation issue is not settled and that it appears significantly intertwined with the statutory prohibition against disability discrimination, a subject to which we now turn.

As we explained above, FEHA creates an associational disability discrimination claim in the manner just described—by reading association with a physically disabled person (§ 12926, subd. (*o*)) into the Act where discrimination based on "physical disability" appears (§ 12940, subd. (a)). By express terms, the two pertinent sections of FEHA make it unlawful to "discharge a person from employment" (§ 12940, subd. (a)) based on physical disability and other characteristics, which include "a perception that the person has any of those characteristics or that the person is associated with a person who has, or is perceived to have, any of those characteristics." (§ 12926, subd. (*o*).)

In *Rope*, our colleagues in Division One found sufficient allegations of both associational disability discrimination and wrongful termination in violation of public policy in a case in which the employee was fired after he announced his plan to donate a kidney to his sister. (*Rope, supra*, 220 Cal.App.4th at pp. 657-658.) Accordingly, *Rope* reversed the trial court's sustaining of a demurrer to those causes of action. (*Id.* at p. 661.) In significant contrast, the *Rope* court rejected the plaintiff's claim of retaliation based on a request to accommodate, impliedly acknowledging that discrimination and accommodation retaliation are separate, albeit related, concepts. (*Id*. at pp. 651-654.)[3]

**b. The Proper Framework for Associational Disability Rests on State, Not Federal, Law**

Even though DHE acknowledges that *Rope* sets out the current California law on associational disability, DHE points to several federal cases in support of its argument that plaintiff has not established a triable issue of fact as to discrimination. DHE relies on federal cases interpreting the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C.

---

[3]     That part of the *Rope* decision dealing with retaliation for requesting accommodation was later superseded by amendments to Government Code section 12940, subdivision (m)(2). (See part 2, *post*.)

11

§ 12101 et seq.). The ADA and the cases cited by DHE are easily distinguished. We do not discard ADA precedents blindly, and indeed we often look to federal law interpreting the ADA when construing FEHA, particularly when the question involves parallel statutory language. (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 57.) But the two statutory schemes are not coextensive. Our Legislature has expressly declared "[t]he law of this state in the area of disabilities provides protections independent from those in the [ADA]. Although the federal act provides a floor of protection, this state's law has always, even prior to passage of the federal act, afforded additional protections." (§ 12926.1, subd. (a).) One instance in which we should part ways with federal case authority is when the statutory language is *not* parallel. That is the case here.

The ADA creates a cause of action for associational disability discrimination using language that structurally is different than FEHA. The "[g]eneral rule" is that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability . . . ." (42 U.S.C. § 12112(a).) "[T]he term 'discriminate against a qualified individual on the basis of disability' includes," among other things, "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." (42 U.S.C. § 12112(b)(4).) Unlike FEHA, the ADA does not define the term "disability" itself as including association with the disabled. Instead, it defines *discrimination* based on association as one type of "'discriminat[ion] against a qualified individual on the basis of disability.'" Elsewhere, the ADA states "'discriminat[ing] against a qualified individual on the basis of disability'" also includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual *with a disability who is an applicant or employee*." (42 U.S.C. § 12112(b)(5)(A), italics added.) One cannot, therefore, read "association with a disabled person" into every use of the term "disability" in the ADA.

Because of these structural differences, including differences in language for associational disability accommodation, federal precedent (e.g., *Erdman v. Nationwide*

12

*Ins. Co.* (3d Cir. 2009) 582 F.3d 500, 510; *Larimer v. International Business Machines Corp.* (7th Cir. 2004) 370 F.3d 698, 700 (*Larimer*); *Den Hartog v. Wasatch Academy* (10th Cir. 1997) 129 F.3d 1076, 1084; *Tyndall v. National Educ. Centers* (4th Cir. 1994) 31 F.3d 209, 214) is less helpful than in other FEHA interpretations.

Since we are not tasked to decide whether either FEHA or the ADA creates a failure to accommodate cause of action based on associational disability, we next turn to DHE's principal argument on appeal—that its motion for summary judgment was properly granted because there is no triable issue of fact as to either discriminatory motive or pretext.[4]

### c. Triable Issues of Material Fact Exist as to Discriminatory Motive and Pretext

Moving to DHE's challenge to the evidence of discriminatory motive and pretext, our starting point is *Rope*. *Rope* relied substantially on *Larimer*, which the *Rope* court described as "the seminal authority on disability-based associational discrimination under the ADA." (*Rope, supra*, 220 Cal.App.4th at p. 656.)

In *Larimer*, the court opined that "[t]hree types of situation are, we believe, within the intended scope of the rarely litigated . . . association section [of the ADA]. We'll call them 'expense,' 'disability by association,' and 'distraction.'" (*Larimer, supra*, 370 F.3d at p. 700.) The court continued: "They can be illustrated as follows: an employee is fired (or suffers some other adverse personnel action) because (1) ('expense') his spouse has a disability that is costly to the employer because the spouse is covered by the company's health plan; (2a) ('disability by association') the employee's homosexual companion is infected with HIV and the employer fears that the employee may also have become infected, through sexual contact with the companion; (2b) (another example of

---

[4]    The dissent criticizes the limitations we established for supplemental briefing, arguing that our discussion of discriminatory motive and pretext "hinges entirely on Junior's failure to accommodate plaintiff's request for a different shift" (dis. opn., *post*, at p. 4), and we therefore should have permitted briefing on the failure to accommodate issue. As we have stated in the text, we do not decide the accommodation issue. Instead, we conclude there is a triable issue of fact as to associational disability discrimination. That issue was fully briefed in respondent's brief at pages 23-37.

disability by association) one of the employee's blood relatives has a disabling ailment that has a genetic component and the employee is likely to develop the disability as well (maybe the relative is an identical twin); (3) ('distraction') the employee is somewhat inattentive at work because his spouse or child has a disability that requires his attention, yet not so inattentive that to perform to his employer's satisfaction he would need an accommodation, perhaps by being allowed to work shorter hours." (*Larimer, supra*, 370 F.3d at p. 700.)[5]

*Rope* acknowledged the three categories in which *Larimer* found a motive for associational disability discrimination (expense, disability by association, and distraction). At the same time, *Rope* observed that *Larimer* "provided an 'illustrat[ive],' rather than an exhaustive, list of the kind of circumstances which might trigger a claim of associational discrimination." (*Rope, supra*, 220 Cal.App.4th at p. 657.) "[A]nd more importantly, *Larimer* was decided under the ADA; the provisions of FEHA are broadly construed and afford employees more protection than the ADA." (*Ibid.*; see § 12926.1, subd. (a).) So while the *Rope* plaintiff's alleged facts did not "fit neatly within" one of *Larimer*'s three categories, the court concluded the plaintiff had sufficiently pleaded a prima facie "'expense'" claim for associational disability discrimination. (*Rope, supra*, at p. 657.)

In *Rope*, the employer hired the plaintiff in late 2010. When hired, he allegedly informed the employer that he intended to take a leave of absence to donate a kidney to his sister in February 2011. He requested a paid leave of absence to do so, under a then-new statute requiring the employer to provide paid leave. Two days before the statute took effect on January 1, 2011, the employer terminated him on the allegedly pretextual

---

[5]     *Larimer* inserted the "qualification concerning the need for an accommodation" into category three "because the right to an accommodation, being limited to disabled employees, does not extend to a nondisabled associate of a disabled person" under the ADA. (*Larimer, supra*, 370 F.3d at p. 700.) FEHA and the ADA differ structurally in the way they create causes of action for associational disability discrimination, as we noted in part 1.b.

basis of poor performance. (*Rope, supra*, 220 Cal.App.4th at pp. 642-643, 658.) The "reasonable inference" from these facts was that the employer "acted preemptively to avoid an expense stemming from [the plaintiff's] association with his physically disabled sister." (*Id.* at p. 658.) The plaintiff had therefore met his burden "to show the adverse employment action occurred under circumstances raising a reasonable inference that the disability of his relative or associate was a substantial factor motivating the employer's decision." (*Ibid.*)

We agree with *Rope* that *Larimer* provides an illustrative, rather than an exhaustive, list of the kinds of circumstances in which we might find associational disability discrimination. The common thread among the *Larimer* categories is simply that they are instances in which the "employer has a motive to discriminate against a nondisabled employee who is merely associated with a disabled person." (*Larimer, supra*, 370 F.3d at p. 702.) As we discuss above, this is an element of a plaintiff's prima facie case—that the plaintiff's association with a disabled person was a substantial motivating factor for the employer's adverse employment action. *Rope* held the alleged facts in that case could give rise to an inference of such discriminatory motive. Our facts do not fit neatly within one of the *Larimer* categories either, but a jury could reasonably infer the requisite discriminatory motive.

A jury could reasonably find from the evidence that plaintiff's association with his disabled son was a substantial motivating factor in Junior's decision to terminate him, and, furthermore, that Junior's stated reason for termination was a pretext. Junior knew that plaintiff needed to finish his assigned route at a time that permitted him to administer dialysis to his son. Bermudez told Junior of plaintiff's needs in this respect and asked Junior to work with plaintiff when Junior took over as plaintiff's supervisor. That same month, plaintiff complained to Bermudez that Junior was scheduling him later than usual, prompting Bermudez to remind Junior of plaintiff's need to be home for his son's dialysis. Despite knowing plaintiff's need to be home early, the month after Junior took over, he scheduled plaintiff for a shift that started at noon, later than plaintiff had ever started before. Junior did this even though eight other shifts well before noon were

available, and even though DHE's customer had specifically requested that plaintiff—the customer's regular driver—do their 7:00 a.m. deliveries. There was no apparent reason why Junior could not have scheduled plaintiff for one of these earlier shifts. (The explanation Junior proffered earlier for not assigning plaintiff the 7:00 a.m. shift was false. Junior told plaintiff the customer was unhappy with his work and did not want him making the customer's deliveries; in fact, the customer's feedback was quite the opposite, and plaintiff never had any performance issues at DHE.) Plaintiff told Junior he could not work the shift and route assigned to him because he had to be home to administer dialysis to his son, but he asked to return the next day for an assignment. It should have been apparent plaintiff was not acting in bad faith or simply being insubordinate. Yet Junior ignored plaintiff's requests. Instead, he laughed and told plaintiff Bermudez was not in charge anymore. Even though DHE's policies allowed for less severe disciplinary action than termination, for plaintiff's one-time refusal to work the shift assigned to him, Junior terminated him.

One reasonable inference from these facts is that Junior, as the person responsible for scheduling the drivers, wanted to avoid the inconvenience and distraction plaintiff's need to care for his disabled son posed to Junior. Thus, Junior engineered a situation in which plaintiff would refuse to work the shift, giving Junior reason to terminate him. In other words, plaintiff's termination for refusal to work the shift was a pretext for Junior's desire to be rid of someone whose disabled associate made Junior's job harder. Just as the facts in *Rope* gave rise to the inference that the employer acted preemptively to avoid the expense of paid leave (*Rope, supra*, 220 Cal.App.4th at p. 658), these facts may give rise to the inference that Junior acted proactively to avoid the nuisance plaintiff's association with his disabled son would cause Junior in the future.

DHE contends a fact finder could not infer discriminatory motive from Junior's actions because it is undisputed that plaintiff had no "set" schedule, he worked a nearly identical shift the day before his termination with no problems, and the time at which he administered dialysis to his son was "fully within his discretion." DHE suggests these facts show Junior had no reason to know plaintiff would refuse to work the shift assigned

16

to him.  But none of this evidence negated Junior's demonstrated knowledge that plaintiff had a disabled son at home constraining his schedule.  Plaintiff may not have had a set schedule in the sense that he did not start or finish his shifts at the exact same time every day, but he had a typical schedule that allowed him to start around 9:00 or 10:00 a.m. and finish by 7:00 or 8:00 p.m.  Furthermore, to say plaintiff had full discretion as to what time he could administer dialysis mischaracterizes plaintiff's responsibility.  It is not as though plaintiff had the freedom to administer dialysis at a time of his choosing.  The way plaintiff described it, the time varied based on his son's condition.  On some days, his son's condition would worsen and he would need to be connected to the machine for a longer period of time.  Plaintiff had learned how to check his son's condition and, on that basis, determine when he would need dialysis.  Plaintiff could work the shift starting at 11:55 a.m. one day before his termination because it did not involve a route to far-away Oxnard and permitted him to be home in time for dialysis.  The facts are that Junior knew plaintiff had a special need related to his disabled son, and plaintiff told Junior that was the reason he could not work the shift on April 23, 2013.  Plaintiff was able to perform satisfactorily for over three years with the schedule that previous supervisors provided, until Junior took over and fired plaintiff shortly after becoming his supervisor.

Viewing the evidence in a light favorable to the nonmoving party and indulging the reasonable inferences in his favor, as we must, plaintiff has demonstrated a triable issue of material fact in response to DHE's showing.  (*Miller v. Department Corrections* (2005) 36 Cal.4th 446, 470 (*Miller*) ["We stress that, because this is an appeal from a grant of summary judgment in favor of defendants, a reviewing court must examine the evidence de novo and *should draw reasonable inferences* in favor of the nonmoving party.  [Citation.]  We believe the Court of Appeal failed to draw such inferences and took too narrow a view of the surrounding circumstances."].)

A relatively recent district court case, *Kouromihelakis v. Hartford Fire Ins. Co.* (D. Conn. 2014) 48 F.Supp.3d 175, is instructive.  *Kouromihelakis* denied an employer's motion to dismiss the plaintiff's claim that he was fired because of the known disability of his father.  The plaintiff alleged that he had to regularly assist in the care of his

17

disabled father, who suffered a debilitating stroke; his job performance was excellent; he periodically did not report for work by 9:00 a.m.; the employer was aware of his father's disability and the reason for the plaintiff's tardiness; the plaintiff asked for, but was refused, a change in hours under the employer's "flex time" policy to accommodate his duties to his disabled father; and the employer terminated him after he arrived late one day. (*Id.* at pp. 178, 180-181.) The court concluded these allegations were sufficient to plead a plausible "'distraction'" claim under *Larimer*, and, viewed in a light most favorable to the plaintiff, supported "a reasonable inference that the defendant terminated the plaintiff's employment based on a belief about future absences." (*Kouromihelakis*, at pp. 180-181.) Like *Kouromihelakis*, the evidence here gives rise to the reasonable inference that Junior terminated plaintiff based on a belief that plaintiff would want earlier shifts in the future. Neither *Kouromihelakis* nor this case fit neatly within the distraction paradigm set forth in *Larimer*, but a neat fit is not required.

The cases on which DHE principally relies do not advance its case. In *Ennis v. National Assn. of Bus. and Educ. Radio, Inc.* (4th Cir. 1995) 53 F.3d 55 (*Ennis*), the court affirmed summary judgment for the employer because the plaintiff could not establish at least two elements of her prima facie case: (1) "at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations"; and (2) "her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." (*Id.* at p. 58.) She could not show she was performing her job adequately because the employer had extensively documented numerous instances of poor job performance over the course of several years. (*Id.* at pp. 61-62.) Her employer terminated her for poor job performance. (*Id.* at p. 57.) She could not show her association with her HIV-positive minor son instead motivated her termination, especially in light of the strong evidence that she had performed poorly for years. (*Id.* at p. 62.) She had no facts credibly giving rise to an inference of unlawful discrimination. (*Ibid.*) Here, by contrast, there was no issue with plaintiff's performance, and thus no concomitant showing that he was legitimately terminated. It was undisputed that he was performing satisfactorily during his entire time with DHE. His request for an earlier

18

schedule only became an issue when Junior took over, and his onetime refusal to work a shift does not equate with the *Ennis* plaintiff's poor performance over several years.

*Magnus v. St. Mark United Methodist Church* (7th Cir. 2012) 688 F.3d 331, 339, is also distinguishable. In *Magnus*, the plaintiff asserted her employer terminated her because of her association with her mentally disabled daughter, emphasizing that the termination came two weeks after she received a merit-based raise, and one day after she arrived at work an hour late due to a medical situation with her daughter. (*Id.* at p. 333.) But the undisputed evidence showed the raise was an across-the-board increase given to all full-time employees regardless of merit, and the employer had decided to terminate her the weekend before she arrived late to work. (*Id.* at pp. 333-334, 338-339.) The plaintiff could not rebut the employer's legitimate, nondiscriminatory reasons for its actions. The employer based the termination on numerous documented performance deficiencies and her refusal to work weekends (because of the need to care for her daughter). (*Id.* at pp. 335-336, 338.) The court observed that the plaintiff's true complaint was that the church failed to accommodate her need to care for her disabled daughter because it mandated that she work weekends—but the ADA did not require employers to reasonably accommodate for an employee's association with a disabled person. (*Magnus*, at pp. 334, 339.) FEHA, however, differs structurally from the ADA when defining associational disability causes of action. Further, like in *Ennis*, the many performance deficiencies in *Magnus* also justified the plaintiff's termination, not just a one-time refusal to work that appears to have been engineered.

In sum, DHE failed to show it was entitled to summary adjudication of the associational disability discrimination cause of action. Plaintiff's evidence gives rise to reasonable inferences of discriminatory motive and pretext.

## 2. *Retaliation*

The retaliation provision of FEHA forbids an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under" FEHA. (§ 12940, subd. (h).) "Employees may establish a prima facie case of unlawful retaliation by showing that (1) they engaged in activities protected by

the FEHA, (2) their employers subsequently took adverse employment action against them, and (3) there was a causal connection between the protected activity and the adverse employment action." (*Miller, supra*, 36 Cal.4th at p. 472.)

DHE asserts plaintiff cannot establish retaliation because he lacks evidence of a protected activity, and even if he engaged in protected activity, he cannot show a causal link between that activity and the adverse employment action. We are not persuaded that DHE is entitled to summary adjudication on these grounds.

"Retaliation claims are inherently fact-specific" (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1052 (*Yanowitz*)), and "protected conduct can take many forms" (*id.* at p. 1042). "Standing alone, an employee's unarticulated belief that an employer is engaging in discrimination will not suffice to establish protected conduct for the purposes of establishing a prima facie case of retaliation, where there is no evidence the employer knew that the employee's opposition was based upon a reasonable belief that the employer was engaging in discrimination." (*Id.* at p. 1046.) "[C]omplaints about personal grievances or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct." (*Id.* at p. 1047.)

But employees need not explicitly and directly inform their employer that they believe the employer's conduct was discriminatory or otherwise forbidden by FEHA. (*Yanowitz, supra*, 36 Cal.4th at p. 1046.) "'[A]n employee is not required to use legal terms or buzzwords when opposing discrimination. The court will find opposing activity if the employee's comments, when read in their totality, oppose discrimination.'" (*Id.* at p. 1047.) "We do not believe employees should be required to elaborate to their employer on the legal theory underlying the complaints they are making, in order to be protected by the FEHA." (*Miller, supra*, 36 Cal.4th at p. 474.) "[C]ourts should recognize that plaintiffs have limited legal knowledge." (*Ibid.*, citing *Moyo v. Gomez* (9th Cir. 1994) 40 F.3d 982, 985.) FEHA does not protect "'only the impudent or articulate. The relevant question . . . is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey

20

the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner.'" (*Yanowitz, supra*, at p. 1047.) Further, FEHA need not actually prohibit the conduct of which the employee complains. (*Miller, supra*, 36 Cal.4th at p. 473.) All that is required is an employee's good faith belief that the conduct was unlawful. (*Ibid.*) Employees' belief that they are complaining about prohibited conduct "may be inferred from the nature and content of their repeated complaints. The issue of a plaintiff's subjective, good faith belief involves questions of credibility and ordinarily cannot be resolved on summary judgment." (*Id.* at p. 476.)

Two California Supreme Court cases in particular illustrate the principle that employees need not complain with the clarity and precision of lawyers to engage in protected conduct: *Miller* and *Yanowitz*. In *Miller*, the plaintiffs asserted they complained about improper sexual relationships between a supervisor and several of his subordinates, favoritism accorded to those subordinates, and subsequent hostile or harassing treatment by those subordinates after the plaintiffs expressed their complaints. (*Miller, supra*, 36 Cal.4th at pp. 452, 472-473.) The Court of Appeal concluded that, although the plaintiffs opposed the supervisor's conduct, "they had not expressed opposition to sex discrimination or sexual harassment. As the court understood the record, '[p]laintiffs were not complaining about sexual harassment but unfairness. This is not protected activity under the FEHA.'" (*Id.* at p. 474.) The Court of Appeal concluded the defendants were entitled to summary judgment on the plaintiffs' retaliation claim. (*Id.* at p. 460.) Our Supreme Court reversed, holding that although the plaintiffs "may not have recited the specific words 'sexual discrimination' or 'sexual harassment,' the nature of their complaint certainly fell within the general purview of FEHA, especially when we recall that this case is before us on review of a grant of summary judgment." (*Id.* at p. 475.)

In *Yanowitz*, the plaintiff's manager instructed her to terminate a dark-skinned female sales associate at a retail store because he did not consider the sales associate to be sufficiently physically attractive. (*Yanowitz, supra*, 36 Cal.4th at p. 1038.) In response, the plaintiff asked the manager for an adequate justification for terminating the sales

21

associate. (*Ibid.*) On several subsequent occasions, the manager asked the plaintiff if she had fired the sales associate, and the plaintiff each time asked for adequate justification. (*Ibid.*) The plaintiff ultimately refused to terminate the sales associate. She never explicitly told the manager that she believed his order was discriminatory. (*Ibid.*) Our Supreme Court held "a trier of fact properly could find that [the manager] knew that [the plaintiff's] refusal to comply with his order to fire the sales associate was based on [the plaintiff's] belief that [the manager's] order constituted discrimination on the basis of sex—that is, the application of a different standard to a female employee than that applied to male employees—and that her opposition to the directive thus was not merely an unexplained insubordinate act bearing no relation to suspected discrimination. [Citation.] A trier of fact properly could find that by repeatedly refusing to implement the directive unless [the manager] provided 'adequate justification,' [the plaintiff] sufficiently conveyed to [the manager] that she considered the order to be discriminatory and put him on notice that he should reconsider the order because of its apparent discriminatory nature." (*Id.* at p. 1048.) Thus, the plaintiff's evidence permitted a reasonable trier of fact to find that she engaged in protected activity. (*Ibid.*)

Likewise, here, the evidence would permit a reasonable trier of fact to find protected activity. Plaintiff complained to Bermudez in March 2013 that Junior had changed his hours so that he was having problems tending to his son. Bermudez communicated the complaint about the change in hours to Junior. Junior already knew that plaintiff sought earlier hours because of his obligation to care for his disabled son— Bermudez told Junior this when Junior took over. When Junior assigned plaintiff a later shift on April 22, 2013, the day before his termination, plaintiff worked it, but complained to Junior that he had "always had help from everyone except you," and pleaded with Junior "to have my job like always." The following day, plaintiff expressed opposition to the shift Junior assigned him because he could not return in time to care for his son, and plaintiff refused to work it. Junior terminated him directly.

The trier of fact could reasonably find that plaintiff's repeated complaints to Bermudez and Junior about the change in his scheduling, when both knew that he needed

earlier hours to administer dialysis to his son, constituted opposition to the denial of an accommodation in his schedule. Put otherwise, plaintiff showed opposition to a practice he believed was unlawful (§ 12940, subd. (h)). Tied as the complaints were to his son's disability, the trier of fact also could find that Junior had reason to know plaintiff's complaints were not just an unexplained insubordinate act bearing no relation to perceived unlawful practices. Rather, one hearing plaintiff's complaints could infer that plaintiff believed the denial of an accommodated schedule to care for his son was unlawful. He need not have used the terms "unlawful" or "reasonable accommodation" themselves. Even assuming FEHA did not actually require DHE to reasonably accommodate plaintiff based on his son's disability, plaintiff's good faith belief that DHE was acting unlawfully was sufficient. (*Yanowitz, supra*, 36 Cal.4th at p. 1043.)

The evidence would also permit a trier of fact to infer a causal link between plaintiff's complaints and his termination. Proximity in time between the employee's protected activity and the adverse employment action satisfies the employee's prima facie burden. (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 388.) Plaintiff's termination came the month after his first complaint and on the heels of his last two complaints. To the extent DHE argues it has offered evidence of a legitimate, nondiscriminatory reason to terminate plaintiff (his refusal to work), we have explained in part 1 that a trier of fact could find this reason pretextual.

DHE additionally maintains that, at best, plaintiff's remarks constituted a request for reasonable accommodation, not a complaint that Junior denied him a reasonable accommodation he previously received. DHE cites *Rope* for the proposition that "a mere request—or even repeated requests—for an accommodation, without more," do not constitute protected activity. (*Rope, supra*, 220 Cal.App.4th at p. 652; accord *Nealy v. City of Santa Monica, supra*, 234 Cal.App.4th at p. 381 [relying on *Rope* to hold that "protected activity does not include a mere request for reasonable accommodation"].)

We note that *Rope* is no longer good law on that point. On July 16, 2015, the Governor approved a bill superseding *Rope* on this issue (Assem. Bill No. 987 (2015-2016 Reg. Sess.)). This amendment to section 12940, effective January 1, 2016, makes it

unlawful for an employer to retaliate or otherwise discriminate against a person for requesting a reasonable accommodation, regardless of whether the employer granted the request. (§ 12940, subd. (m)(2).) The Legislature's findings in enacting the amendment included this: "Notwithstanding any interpretation of this issue in *Rope* . . . , the Legislature intends (1) to make clear that a request for reasonable accommodation on the basis of religion or disability is a protected activity, and (2) by enacting paragraph (2) of subdivision (m) . . . , to provide protection against retaliation when an individual makes a request for reasonable accommodation under these sections, regardless of whether the request was granted. With the exception of its holding on this issue, *Rope* . . . remains good law." (Stats. 2015, ch. 122, § 1, subd. (d), approved by Governor, July 16, 2015.)

DHE contends Assembly Bill No. 987 (2015-2016 Reg. Sess.) does not apply retroactively to this case to make a request for accommodation protected activity.[6] "A statute has retrospective effect when it substantially changes the legal consequences of past events." (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243.) To decide whether an amendment applies to actions that occurred before its enactment, the court asks as a threshold matter whether the amendment merely clarified existing law or changed existing law. (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 471.) "[A] statute that merely *clarifies*, rather than changes, existing law does not operate retrospectively even if applied to transactions predating its enactment" "because the true meaning of the statute" was always the same. (*Western Security Bank v. Superior Court, supra*, at p. 243.) "In that event, . . . liability would have existed at the time of the actions, and the amendment would not have changed anything." (*McClung v. Employment Development Dept., supra*, at p. 472.) But if the amendment changed the

---

[6] Plaintiff raised Assembly Bill No. 987 (2015-2016 Reg. Sess.) in his reply brief, and the bill became effective after briefing in this matter was complete. Our original opinion in this matter discussed and relied on Assembly Bill No. 987. DHE filed a petition for rehearing arguing in part that we should permit supplemental briefing on whether Assembly Bill No. 987 operates retroactively. We granted the petition in this respect and permitted supplemental briefing, but as we discuss, we ultimately need not decide the retroactivity issue.

law and imposed liability for earlier actions, the court must decide if the change applies retroactively. (*Ibid.*)

DHE argues Assembly Bill No. 987 (2015-2016 Reg. Sess.) effected a change in the law, which change applies prospectively only; therefore, *Rope* governs and precludes plaintiff's retaliation cause of action. Plaintiff, on the other hand, argues Assembly Bill No. 987 merely clarified existing law such that Assembly Bill No. 987 applies to acts predating its enactment. We need not decide whether Assembly Bill No. 987 applies in this case.[7] Even assuming it achieved a change in the law that does not apply retroactively, and thus *Rope* is not superseded for our purposes, *Rope* does not dictate that we adjudicate the retaliation cause of action in DHE's favor.

As we have explained, *Rope* held that mere requests for accommodation without anything more did not represent protected activity. (*Rope, supra*, 220 Cal.App.4th at p. 652.) *Rope* emphasized that protected activity consists of "oppos[ing] any practices forbidden" by FEHA (§ 12940, subd. (h)), while mere requests for an accommodation do not "demonstrate some degree of opposition to or protest of the employer's conduct." (*Rope, supra*, at pp. 652-653; accord *Nealy v. City of Santa Monica, supra*, 234 Cal.App.4th at p. 381 [request for an accommodation and engaging in the interactive process with employer did not amount to "'oppos[ing] any practices forbidden under' FEHA"].) Plaintiff here did more than simply request an accommodation. A reasonable juror could find that his repeated complaints about the sudden changes to his schedule represented "some degree of opposition" to DHE's failure to continue to provide that schedule. In other words, we disagree with DHE's characterization that, at best, plaintiff's remarks constituted a mere request for reasonable accommodation.

---

[7] Our colleagues in the Fourth District recently considered these issues in *Moore v. Regents of the University of California* (2016) 248 Cal.App.4th 216.) They held that Assembly Bill No. 987 (2015-2016 Reg. Sess.) represented a change in the law, not a clarification, and Assembly Bill No. 987 did not operate retroactively. (*Moore*, at pp. 246-247.)

*3. Failure to Prevent Discrimination and Wrongful Termination in Violation of Public Policy*

In DHE's moving papers, it stated one argument against the causes of action for failure to prevent discrimination and wrongful termination—that they failed as a matter of law when no discrimination or other unlawful conduct in violation of public policy occurred. On appeal, DHE argues the same. Given that DHE is not entitled to summary adjudication on the discrimination and retaliation causes of action, it has not shown it is entitled to summary adjudication on failure to prevent discrimination and wrongful termination.

*4. Costs Appeal*

The court awarded DHE costs as the prevailing party in the action. Plaintiff appealed from the court's order denying his motion to tax costs. Because we are reversing the judgment, and DHE is no longer the prevailing party, DHE is no longer entitled to costs. The order denying the motion to tax costs is also reversed.

## DISPOSITION

The judgment in B261165 is reversed. On appeal, plaintiff has challenged the court's ruling on only four of his eight causes of action. The court shall enter an order granting DHE's motion for summary adjudication on the causes of action plaintiff has abandoned: (1) failure to provide reasonable accommodation, (2) failure to engage in good faith interactive process, (3) hostile work environment, and (4) failure to prevent harassment. The court's order shall deny summary adjudication on the remaining causes of action: (1) disability discrimination, (2) failure to prevent discrimination, (3) retaliation, and (4) wrongful termination in violation of public policy. The order denying the motion to tax costs in B262524 is reversed. Plaintiff shall recover his costs on appeal.


FLIER, J.

I CONCUR:


RUBIN, Acting P. J.

26

**Castro-Ramirez v. Dependable Highway Express, Inc.**
**B261165; B262524**
**Grimes, J., Dissenting.**

Respectfully, I dissent.

The majority in the original published opinion in this appeal, filed April 4, 2016, held that FEHA creates a duty according to the plain language of the Act to provide reasonable accommodations to an applicant or employee who is associated with a disabled person. The present majority opinion has retreated from that holding. My colleagues state they do not decide whether FEHA establishes a separate duty to reasonably accommodate employees who associate with a disabled person. (Maj. opn. *ante*, at p. 9.) The majority neither acknowledges its prior holding nor explains the retreat from it. The majority does, however, "find accommodation relevant as to plaintiff's discrimination cause of action." (Maj. opn. *ante*, at p. 10.) And, while repeating that it does not decide the point, the majority observes that Government Code section 12940, subdivision (m)[1] – making it unlawful to fail to reasonably accommodate the known physical disability of an applicant or employee – "may reasonably be interpreted to require accommodation based on the employee's association with a physically disabled person." (Maj. opn. *ante*, at pp. 10-11.)

While ordinarily I would not discuss an undecided issue, I am compelled to do so here. For while the majority purports not to decide whether FEHA requires an employer to reasonably accommodate employees who associate with a disabled person, in my view the majority in effect has done just that. I disagree with the majority's approach for four reasons.

First, despite the grant of rehearing in this case, the majority explicitly refused to allow the parties to brief the critical issue of whether and how accommodation is relevant to plaintiff's discrimination cause of action. Second, I cannot agree with the majority's proposition that the ADA and the federal cases decided under it are "easily distinguished"

---

[1] Further statutory references are to the Government Code.

1

and that we should "part ways with federal case authority" because the statutory language in the ADA is not parallel with FEHA. (Maj. opn. *ante*, at p. 12.) On the contrary, I see no reason to construe FEHA as departing from the ADA on this issue. Third, unless there *is* a duty to adjust the work schedule of a nondisabled employee to accommodate the needs of a disabled associate, there is no evidence from which to infer the defendant employer here discriminated against plaintiff when it assigned a shift that did not meet those needs, and fired plaintiff for refusing the assignment. Fourth, plaintiff did not demonstrate a material factual dispute whether he engaged in a protected activity to support a retaliation claim, because under the law in effect during his employment with defendant, repeated requests for an accommodation, without more, did not constitute protected activity. In short, the conduct at the heart of plaintiff's claim is defendant's refusal to assign a shift that would allow plaintiff to tend to his disabled son. No authority has held an employer must do so, and nor should we.

1.      **The Majority Did Not Comport With Government Code  Section 68081 In Partially Denying Defendant's Petition For Rehearing.**

In my earlier dissent, I pointed out that plaintiff expressly told us in his briefs he had abandoned the theory that an employer has a duty to accommodate a nondisabled employee who is associated with a disabled person. The majority states that plaintiff abandoned the reasonable accommodation cause of action. (Maj. opn. *ante*, at p. 9.) Not so; plaintiff did not merely abandon one cause of action. He expressly abandoned the premise of a duty to accommodate a disabled associate. Plaintiff repeatedly told us "this is not an accommodation case." Plaintiff asserted the issue "whether reasonable accommodations are available to the associates of the disabled . . . is not before this Court."

Instead, plaintiff asserted that even if he was not entitled to an accommodation under FEHA, he was "entitled to an intermittent medical leave of absence to care for his disabled son pursuant to the CFRA [California Family Rights Act (§ 12945.2)], at least on the day he was terminated." Plaintiff stated: "The fact that [defendant] may not have discriminated because it was not obligated to affirmatively act to protect [plaintiff's]

2

employment under one set of laws (the reasonable accommodation provision of the FEHA) does not mean it did not discriminate when another set of laws (the child care leave provision of the CFRA) obligated [defendant] to affirmatively act to protect his employment. In effect, the CFRA forbade [defendant] from terminating [plaintiff] on April 23, 2013 after he voiced his inability to work his schedule for the day because of his child care obligations to his disabled son."

Undeterred by the absence of briefing on an issue that no party proposed, the majority held in the opinion filed April 4, 2016, that FEHA creates a duty to accommodate a nondisabled employee who is associated with a disabled person.

Thereafter, defendant petitioned for rehearing on three grounds, the first two of which are these: "First, the Court based its decision to reverse the dismissal of Plaintiff's associational disability discrimination claim on its determination that [FEHA] requires employers to accommodate non-disabled employees with disabled relatives. However, Plaintiff did not appeal the dismissal of his failure to accommodate claim under FEHA and expressly abandoned this theory of liability on appeal. Thus, neither party briefed the issue. [¶] Second, the Court based its decision to reverse the dismissal of Plaintiff's retaliation claim in part on its determination that Plaintiff engaged in protected conduct by requesting an accommodation. In coming to this conclusion, however, the Court relied on a change in the law, the legislature's enactment of AB987, which occurred during the parties' briefing process. AB987 amended FEHA to state that requests for accommodation are protected activity. However, the Court never requested supplemental briefing on the issue of whether AB987 operates retroactively, which [defendant] contends it does not. Thus, [defendant] never had an opportunity to brief this issue, as Plaintiff raised it for the first time in his reply brief."

The majority issued an order on April 27, 2016, granting in part and denying in part the petition for rehearing. The order granted the parties permission to brief only the second issue, "whether the amendment to Government Code section 12940, subdivision (m), effective January 1, 2016 [(Assem. Bill No. 987)], applies in this case." Assembly Bill No. 987 went into effect more than two years after plaintiff's termination

3

of employment with defendant. After the parties submitted their briefs, *Moore v. Regents of the University of California* (2016) 248 Cal.App.4th 216 (*Moore*) was decided. *Moore* held that Assembly Bill No. 987 represented a change in the law, not a clarification, and Assembly Bill No. 987 did not operate retroactively. (*Moore*, at p. 247.) The majority now finds it need not decide this issue.

Likewise, the majority now says it does not decide whether FEHA establishes a separate duty to reasonably accommodate employees who associate with a disabled person. However, the majority finds accommodation relevant to plaintiff's discrimination cause of action. (Maj. opn. *ante*, at pp. 9, 10.) The majority reasons that "when section 12940, subdivision (m) requires employers to reasonably accommodate 'the known physical . . . disability of an applicant or employee,' read in conjunction with other relevant provisions, subdivision (m) may reasonably be interpreted to require accommodation based on the employee's association with a physically disabled person. Again, given plaintiff's concession, we do not decide this point. We only observe that the accommodation issue is not settled and that it appears significantly intertwined with the statutory prohibition against disability discrimination . . . ." (Maj. opn. *ante*, at pp. 10-11.)

The majority's discussion of what it perceives as triable issues of material fact as to discriminatory motive and pretext (maj. opn. *ante*, at pp. 15-17) hinges entirely on Junior's failure to accommodate plaintiff's request for a different shift so he could care for his disabled son.

Defendant's petition for rehearing sought permission to brief the accommodation issue that the majority characterizes as "not settled." As set forth above, defendant's first basis for seeking rehearing was that "the Court based its decision to reverse the dismissal of Plaintiff's associational disability discrimination claim on its determination that [FEHA] requires employers to accommodate non-disabled employees with disabled relatives." The majority opinion does not comport with section 68081 because it rests on an issue that no party proposed and that was never briefed, even after defendant timely petitioned for rehearing to brief that issue. Section 68081 provides that before issuing a

4

decision, "based upon an issue which was not proposed or briefed by any party to the proceeding, the court shall afford the parties an opportunity to present their views on the matter through supplemental briefing." And "[i]f the court fails to afford that opportunity, a rehearing shall be ordered upon timely petition . . . ." (*Ibid.*)

Ten years after section 68081's enactment, the Court of Appeal expressed the "significant principle" that "judges, including appellate judges, are required to follow the law. In this case, the Appellate Department of the Los Angeles Superior Court decided a case on a point not raised by the parties, and without notice to the parties that it might do so." (*California Casualty Ins. Co. v. Appellate Department* (1996) 46 Cal.App.4th 1145, 1147 (*California Casualty*).)

In *California Casualty*, the defense in a court trial elicited an expert opinion over plaintiff's objection. On appeal, the plaintiff argued the opinion was inadmissible and the error was prejudicial. The defendant responded there was no abuse of discretion and no prejudice. The Appellate Department scrutinized the record to determine if the expert opinion was admissible and in doing so also scrutinized the plaintiff's objection, concluding it was inadequate to preserve the issue for appellate review – an issue no party had asserted or briefed. The Court of Appeal found it was error to decide the case on that ground without warning the parties the court was considering that ground, and giving them an opportunity to brief it. (*California Casualty, supra,* 46 Cal.App.4th at pp. 1148-1149.)

I believe the majority had a duty to permit briefing on the issue of whether and how accommodation is "relevant to" and "significantly intertwined" with plaintiff's discrimination cause of action before it decided an "unsettled" issue which was not proposed or briefed by any party. (*Adoption of Alexander S.* (1988) 44 Cal.3d 857, 864-865 [in denying a party's request for an opportunity to submit supplemental briefing on a point first raised by the Court of Appeal in oral argument, the Court of Appeal did not comport with section 68081; Court of Appeal had a duty "upon timely request to allow supplemental briefing before it renders a decision which was not proposed or briefed by any party"].)

5

**2.  No Sound Basis Exists For Construing FEHA As Departing From Federal Case Law Governing Associational Disability Discrimination Under The ADA.**

FEHA prohibits disability discrimination.  It is unlawful for an employer, "because of the . . . physical disability . . . of any person, to . . . discharge the person from employment . . . or to discriminate against the person . . . in terms, conditions, or privileges of employment."  (§ 12940, subd. (a).)  FEHA also forbids discrimination based on a person's association with a person with a physical disability.  Section 12926 provides in pertinent part that " 'physical disability, [and other protected characteristics]' includes a perception that . . . the person is associated with a person who has, or is perceived to have, any of those characteristics."  (§ 12926, subd. (o).)

There is very little California authority on discrimination against a person associated with a disabled person.  The only authority expressly involving a claim of associational disability discrimination is *Rope v. Auto-Chlor System of Washington, Inc.* (2013) 220 Cal.App.4th 635 (*Rope*).  In *Rope*, the court concluded the plaintiff pleaded facts sufficient to support a claim for association-based disability discrimination.  (*Id.* at p. 642.)  The plaintiff alleged he informed his employer at the time he was hired in September 2010 that he intended to donate a kidney to his sister in February 2011.  He requested a paid leave of absence to recuperate from the surgery, under a then-new statute requiring the employer to provide paid leave, effective as of January 1, 2011.  Two days before the statute took effect, the employer terminated the plaintiff's employment on the allegedly pretextual basis of poor performance.  (*Id.* at pp. 642-643.)

*Rope* observed that the "reasonable inference is that [the employer] acted preemptively to avoid an expense stemming from [the plaintiff's] association with his physically disabled sister."  (*Rope, supra,* 220 Cal.App.4th at p. 658.)  *Rope* relied on Judge Posner's opinion in *Larimer v. International Business Machines* (7th Cir. 2004) 370 F.3d 698 (*Larimer*), describing *Larimer* as "the seminal authority on disability-based associational discrimination under the ADA . . . ."  (*Rope*, at p. 656.)

6

In *Larimer*, the court identified three circumstances in which an employer might have a motive to discriminate against an employee who is associated with a disabled person, and concluded these types of situation were within the intended scope of the "rarely litigated" association provision of the ADA. (*Larimer, supra,* 370 F.3d at p. 700.) The court denominated the categories as "expense," "disability by association," and "distraction." (*Ibid.*)

*Larimer* explained: "[The three types] can be illustrated as follows: an employee is fired (or suffers some other adverse personnel action) because (1) ('expense') his spouse has a disability that is costly to the employer because the spouse is covered by the company's health plan; (2a) ('disability by association') the employee's homosexual companion is infected with HIV and the employer fears that the employee may also have become infected, through sexual contact with the companion; (2b) (another example of disability by association) one of the employee's blood relatives has a disabling ailment that has a genetic component and the employee is likely to develop the disability as well (maybe the relative is an identical twin); (3) ('distraction') the employee is somewhat inattentive at work because his spouse or child has a disability that requires his attention, yet not so inattentive that to perform to his employer's satisfaction he would need an accommodation, perhaps by being allowed to work shorter hours." (*Larimer, supra,* 370 F.3d at p. 700.) As to the "distraction" category, the court continued: "The qualification concerning the need for an accommodation (that is, special consideration) is critical because *the right to an accommodation, being limited to disabled employees, does not extend to a nondisabled associate of a disabled person.*" (*Ibid.*, citing cases and 29 C.F.R. § 1630.8, italics added.)

In *Larimer*, the court affirmed summary judgment for the employer, where the employee was fired shortly after his twin children, who were born with a variety of serious medical conditions because of their prematurity, came home from the hospital. (*Larimer, supra,* 370 F.3d at p. 699.) The court held the plaintiff "must lose" because the case fit none of the categories the court described. (*Id.* at pp. 700, 701 [no evidence that health care costs were an issue, no evidence of communicable or genetic disease, and "no

7

evidence that [the plaintiff] was absent or distracted at work because of his wife's pregnancy or the birth and hospitalization of his daughters"].)

The majority dismisses the ADA and the federal cases construing it, saying they are "easily distinguished" and that we should "part ways with federal case authority" because the statutory language of FEHA and the ADA are "*not* parallel." (Maj. opn. *ante*, at p. 12.) The majority reasons that "association with a physically disabled person appears to be itself a disability under FEHA" (maj. opn. *ante*, at p. 10), which defines a physical disability (and all other protected characteristics) to include a perception that "the person is associated with a person who has, or is perceived to have, any of those characteristics." (§ 12926, subd. (o).) According to the majority, FEHA thus "differs structurally" from the ADA (maj. opn. *ante*, at p. 19), which forbids discrimination against a qualified individual on the basis of disability, and defines such discrimination to encompass "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association . . . ." (42 U.S.C. § 12112(b)(4).)

I recognize the literal differences in wording, but I cannot agree that FEHA may be construed as declaring that a person with no disability ipso facto becomes "disabled" by association with a disabled person. I see no material difference in the purpose or effect of the two statutes so far as their associational disability discrimination provisions are concerned. FEHA, of course, is broader than the ADA. *Rope* and other authorities, and FEHA itself, confirm that the provisions of FEHA "are broadly construed and afford employees more protection than the ADA." (*Rope, supra,* 220 Cal.App.4th at p. 657, citing *Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 57 ["because FEHA 'provides protections independent from those in the [ADA]' and 'afford[s] additional protections [than the ADA]' (§ 12926.1, subd. (a)), state law will part ways with federal law in order to advance the legislative goal of providing greater protection to employees than the ADA"].)

8

But in many ways FEHA is similar to the ADA, and we should not construe FEHA as departing from the ADA without a clear legislative statement of intent to do so. (See generally *Green v. State of California* (2007) 42 Cal.4th 254, 262-263 ["In passing [1992 amendment to FEHA], at least one legislative analysis observed the Legislature's 'conformity [to the ADA rules] will benefit employers and businesses because they will have one set of standards with which they must comply in order to be certain that they do not violate the rights of individuals with physical or mental disabilities.' "].) Our Legislature has expressly provided broader protection in FEHA than the ADA in certain important areas. (See Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2015) ¶¶ 9:2091 to 9:2100, pp. 9-172 to 9-173.) Notably, the Legislature has *not* stated an intent that FEHA depart from the ADA by requiring an employer to accommodate a nondisabled employee with a disabled associate.

**3.      The Evidence Does Not Permit An Inference That The Disability Of Plaintiff's Son Was A Substantial Factor Motivating The Employer's Decision To Terminate Plaintiff.**

The majority, after "part[ing] ways with federal case authority," and observing that it was "not tasked to decide whether either FEHA or the ADA creates a failure to accommodate cause of action based on associational disability" (maj. opn. *ante*, at pp. 12, 13), finds that triable issues of material fact exist that prevent summary judgment on plaintiff's associational disability discrimination claim. I again disagree, seeing no evidence from which to infer that the employer discriminated against plaintiff when it assigned a schedule that did not meet the needs of his disabled son, and fired plaintiff for refusing the assignment.

To avoid summary judgment, plaintiff was required to produce evidence that his discharge "occurred under circumstances raising a reasonable inference that the disability of his [son] was a substantial factor motivating the employer's decision." (*Rope, supra,* 220 Cal.App.4th at p. 658; see *ibid.* [" 'if the disability plays no role in the employer's decision . . . then there is no *disability* discrimination' "].)

9

The majority appears to accept the fundamental principles stated in *Rope* and *Larimer*, described in part 2, *ante*: namely, that there are three types of situation that evidence a motive for associational disability discrimination: expense, disability by association, and distraction. The majority points out that this case does not "fit neatly within the distraction paradigm set forth in *Larimer*, but a neat fit is not required." (Maj. opn. *ante,* at p. 18.) I agree with that statement, and with *Rope*'s observation that *Larimer* provided an illustrative, rather than an exhaustive, list of the kinds of circumstances in which an employer might have a motive to discriminate against an employee who is associated with a disabled person. (*Rope, supra,* 220 Cal.App.4th at p. 657.) But while a "neat fit" is not required, the evidence here does not show any fit of any kind in any of *Larimer*'s categories (or any other circumstance showing a discriminatory motive).

The critical element of any circumstance that might trigger a claim of associational disability discrimination is that it suggests the employer "has a *motive* to discriminate against a nondisabled employee who is merely associated with a disabled person." (*Larimer, supra,* 370 F.3d at p. 702, italics added.) That is the point of the *Larimer* categories. An employer may be motivated to discriminate against an employee based on an associate's disability, where the associate's disability may cost the employer money (expense), or where the employer fears the employee will become ill from associating with a disabled person (disability by association), or where the employer perceives the employee is somewhat inattentive at work due to the distraction of caring for a disabled associate, though not to the point of needing a schedule accommodation (distraction). But plaintiff here presents no evidence of any of these circumstances, or any other circumstances suggesting a motive to fire him because of his son's disability.

As I noted earlier, the majority's discussion of what it perceives as triable issues of material fact as to discriminatory motive and pretext (maj. opn. *ante*, at pp. 15-17) hinges entirely on Junior's failure to accommodate plaintiff's request for a different shift so he could care for his disabled son. In effect, the majority is saying that evidence of Junior's refusal to make the schedule change plaintiff requested is evidence that he did so because

10

of the son's disability. That is a (mistaken) tautology, not cause and effect, and it necessarily assumes that the employer had an obligation to accommodate plaintiff's desired schedule. There is no such obligation under the ADA or FEHA, and no authority – until now – suggests otherwise.

Indeed, *Larimer* specifically held that under the ADA, there is no associational disability discrimination claim where the employer refuses to accommodate the nondisabled employee, because "the right to an accommodation, being limited to disabled employees, does not extend to a nondisabled associate of a disabled person." (*Larimer, supra,* 370 F.3d at p. 700.) The majority rejects the *Larimer* principle in its footnote 5 because it again asserts the ADA and FEHA "differ structurally." (Maj. opn. *ante*, at p. 14.) This rejection of the *Larimer* principle is simply another demonstration that the majority's decision rests on a point they claim not to be deciding: that FEHA obliges the employer to accommodate the disabled associate of a nondisabled employee. I am aware of no other authority or scholarly writing that takes issue with the *Larimer* principle; to the contrary, as explained below, federal cases before and after *Larimer* consistently hold there is no duty to accommodate a nondisabled employee by changing his schedule so he can care for a disabled associate.

These authorities illustrate the requirement for a showing of discriminatory motive in associational disability discrimination cases. One of those is *Erdman v. Nationwide Ins. Co.* (3d Cir. 2009) 582 F.3d 500 (*Erdman*). There, the Third Circuit affirmed summary adjudication for the employer on the plaintiff's claim she was fired because of her daughter's known disability (Down syndrome). The court reiterated that "the association provision does not obligate employers to accommodate the schedule of an employee with a disabled relative" (*id.* at p. 510), and the pertinent question is whether a reasonable jury could infer from the evidence that the plaintiff was terminated "*because of* her [daughter's] disability." (*Ibid.*) The answer was no.

*Erdman* explained: "[T]here is a material distinction between firing an employee because of a relative's disability and firing an employee because of the need to take time off to care for the relative. . . . [The plaintiff] must show that [the employer] was

11

motivated by [the daughter's] disability rather than by [the plaintiff's] stated intention to miss work; in other words, that she would not have been fired if she had requested time off for a different reason." (*Erdman, supra,* 582 F.3d at p. 510.) The court concluded the record was "devoid of evidence indicating that [the employer's] decision to fire [the plaintiff] was motivated by [the daughter's] disability. Indeed, [the employer] was aware of [the daughter's] disability for many years before [the plaintiff] was fired. The most [the plaintiff] can hope to show is that she was fired for requesting time off to care for [the daughter], not because of unfounded stereotypes or assumptions on [the employer's] part about care required by disabled persons." (*Erdman, supra,* 582 F.3d at p. 511.)[2]

This case is virtually the same as *Erdman*. It is undisputed that defendant hired plaintiff, despite knowing of his son's disability and plaintiff's need for work schedule accommodations; his job did not have a set start and end time, and his hours varied throughout his employment; defendant accommodated plaintiff's request for earlier schedules for some years, until a new supervisor (who scheduled plaintiff to shifts that regularly earned him more money than he had with previous supervisors) one day

---

[2] See also *Magnus v. St. Mark United Methodist Church* (7th Cir. 2012) 688 F.3d 331, 339 (*Magnus*) (affirming summary judgment for the defendant employer, rejecting claim the timing of plaintiff's termination (two weeks after she received a raise, and one day after she arrived late to work because of a medical situation with her disabled daughter) was sufficient to infer associational discrimination; "despite the fact that the [employer] may have placed [the plaintiff] in a difficult situation considering her commendable commitment to care for her disabled daughter [by requiring her to work weekends], she was not entitled to an accommodated schedule"); *Den Hartog v. Wasatch Academy* (10th Cir. 1997) 129 F.3d 1076, 1077, 1084 (affirming summary judgment for an employer who discharged the plaintiff teacher after his adult son with bipolar affective disorder attacked and threatened several members of the school community; the ADA "does not require an employer to make any 'reasonable accommodation' to the disabilities of relatives or associates of an employee who is not himself disabled"); *Tyndall v. National Educ. Centers, Inc.* (4th Cir. 1994) 31 F.3d 209, 214 (affirming summary judgment for the employer, who had discharged a disabled employee who was frequently absent from work, due both to her own disability and to the disability of a family member; the ADA "does not require an employer to restructure an employee's work schedule to enable the employee to care for a relative with a disability").

12

assigned plaintiff to a schedule virtually identical to the shift plaintiff accepted the day before without complaint; and plaintiff refused the assignment after being warned that if he did so, he would be fired. Nothing about this suggests Junior's decision to fire plaintiff was motivated by the son's disability.

The majority discusses two cases that defendant cites in connection with the absence of evidence that plaintiff's association with his son motivated his termination. These are *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.* (4th Cir. 1995) 53 F.3d 55 (*Ennis*) and *Magnus, supra,* 688 F.3d 331. In both of these cases, the employers terminated the plaintiffs for poor performance, and the courts rejected the plaintiffs' claims they were discharged because of their association with disabled family members, finding the evidence insufficient to infer associational disability discrimination. (*Ennis,* at p. 62 ["[m]ere unsupported speculation [that the employer discharged the plaintiff because of possible impact of her child's HIV positive status on the employer's insurance rates] is not enough to defeat a summary judgment motion"]; *Magnus,* at p. 338 [timing of the plaintiff's termination one day after her late arrival because of a medical issue with her disabled daughter was insufficient to infer associational discrimination].) The majority points out that here, "by contrast [with *Ennis*], there was no issue with plaintiff's performance, and thus no concomitant showing that he was legitimately terminated," and "the many performance deficiencies in *Magnus* also justified the plaintiff's termination . . . ." (Maj. opn. *ante*, at pp. 18, 19.)

I see no pertinence in the majority's distinction. In this case, defendant terminated plaintiff for refusing to work an assigned shift, not for poor performance, and the issue (the same issue as in *Ennis* and *Magnus*) is whether plaintiff has produced evidence from which a jury could infer that the real motive for the termination was his son's disability. As in *Ennis* and *Magnus*, plaintiff has not done so, and his job performance has nothing to do with it.

The majority insists that the facts "give rise to the inference that Junior acted proactively to avoid the nuisance plaintiff's association with his disabled son would cause

13

Junior in the future."[3]  (Maj. opn. *ante*, at p. 16.)  Once again, this assertion depends on the principle the majority claims it is not deciding:  that the employer is obliged to accommodate a nondisabled employee who is associated with a disabled person.  In my view, as explained above, there is no authority for that conclusion, federal or state, and no reason for construing FEHA in a manner different from federal authorities construing the ADA.

I am sympathetic to plaintiff's point that his previous supervisors had accommodated his requests for earlier shifts, and that his last supervisor could have assigned him to earlier shifts on April 23, 2013.  But I am left with no basis in the law on which to find a FEHA violation based on the assignment of a route to Oxnard with a noon start time (a schedule virtually identical to the shift plaintiff accepted the day before

---

[3]  The majority also finds *Kouromihelakis v. Hartford Fire Ins. Co.* (D.Conn. 2014) 48 F.Supp.3d 175 to be instructive.  (Maj. opn. *ante*, at p. 17.)  I do not, because the facts are so different.  In *Kouromihelakis*, the district court denied the defendant employer's motion to dismiss the plaintiff's claim he was fired because of the known disability of his father.  The plaintiff was a regional sales consultant.  His regular work hours were 9:00 a.m. to 6:00 p.m. with lunch from 1:00 to 2:00 p.m., but he was exempt, paid a salary, not an hourly wage.  As such, the defendant's tardiness policy did not apply to him.  The plaintiff alleged he was required to assist in the care of his disabled father; his job performance was excellent; he was periodically unable to report for work by 9:00 a.m.; the employer was aware of his father's disability and the reason for the plaintiff's tardiness; and the defendant had a "flex time" policy but denied the plaintiff's requests to change his hours so he could care for his disabled father.  One day, the plaintiff was approved to take four hours personal time off, but when he arrived at work at 1:26 p.m., his supervisor considered him late and terminated him for tardiness.  (*Kouromihelakis,* at p. 178.)  The court concluded these allegations were "sufficient to plead a plausible 'distraction' claim," and supported "a reasonable inference that the defendant terminated the plaintiff's employment based on a belief about future absences."  (*Id.* at pp. 180-181.)  The majority likens *Kouromihelakis* to this case, saying the evidence here gives rise to the reasonable inference that Junior terminated plaintiff "based on a belief that plaintiff would want earlier shifts in the future."  (Maj. opn. *ante*, at p. 18.)  But here, plaintiff was an hourly worker whose job required him to report on time for whatever shift and route he was assigned on any given day, there is no evidence here that defendant had a "flex time" policy, and there is no evidence suggesting plaintiff was discharged because Junior feared in the future he would miss work to care for his son.

14

without complaint). Even in the case of a *disabled employee*, toward whom the employer *does* owe a duty to reasonably accommodate, it has been held that the employer's past accommodations did not prove the reasonableness of the employee's request to continue to provide those accommodations. (See, e.g., *Terrell v. USAir* (11th Cir. 1998) 132 F.3d 621, 626, fn. 6 [employer who temporarily reduced employee's working hours to accommodate carpal tunnel syndrome was not obliged to create part-time position; "An employer that 'bends over backwards to accommodate a disabled worker . . . must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.' "].)

However desirable it might seem for the law to require an employer to accommodate the needs of the disabled associate of a nondisabled employee, the courts are not free to expand the law in this way without any basis in the statutory language or other precedent.

4. **The Retaliation Claim Fails Because The Evidence Does Not Permit An Inference That Plaintiff Engaged In Protected Activity.**

Finally, turning to the retaliation claim, I disagree with the majority's conclusion that plaintiff demonstrated a triable issue of fact as to the first element of a retaliation claim: that he engaged in a protected activity. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).) Plaintiff contends he "oppos[ed] associational disability discrimination" when he complained about his supervisor "interfering with his schedule." Plaintiff does *not* contend he requested an accommodation, which in any event would not have demonstrated an essential element of a retaliation claim. During plaintiff's employment with defendant, a mere request, or even repeated requests, for an accommodation, without more, did not constitute protected activity under FEHA. (*Rope, supra,* 220 Cal.App.4th at pp. 652-653.)

The majority notes that *Rope* is no longer good law on that point. (Maj. opn. *ante*, at p. 23.) But the only court to have considered the question has held that, before Assembly Bill No. 987 became effective on January 1, 2016, a mere request, or even repeated requests, for an accommodation did not constitute protected activity. (*Moore,*

15

*supra,* 248 Cal.App.4th at p. 247 [where the plaintiff alleges the defendant engaged in retaliation before January 1, 2016, the effective date of Assembly Bill No. 987, a request for accommodation, without more, is not sufficient to constitute protected activity; plaintiff must have engaged in opposition to practices forbidden under FEHA or filed a complaint, testified, or assisted in any proceeding under FEHA].)[4]

I disagree with the majority's conclusion that plaintiff's repeated complaints about the changes to his schedule represented "some degree of opposition" to defendant's failure to give plaintiff the schedule he wanted, so as to constitute protected activity. While a formal accusation of discrimination is unnecessary, it *is* necessary that " 'the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner.' [Citation.]" (*Yanowitz, supra,* 36 Cal.4th at p. 1047.) There is

---

[4] Though the Legislature clearly intended to change the law by enacting Assembly Bill No. 987 to declare a request for accommodation is protected activity, it is not at all clear that the Legislature intended the change to apply to a request by a nondisabled employee to accommodate a disabled relative or associate. With no California or federal authority establishing a duty to accommodate someone who is neither a job applicant nor an employee, I do not presume that is what the Legislature intended. In its letter briefs, defendant provided legislative history of Assembly Bill No. 987 indicating it was intended to protect employees requesting accommodations for their *own* disabilities. (See, e.g., Legis. Counsel's Dig., Assem. Bill No. 987 (2015-2016 Reg. Sess.) Stats. 2015, ch. 122 ["This bill would, in addition, prohibit an employer or other covered entity from retaliating or otherwise discriminating against a person *for requesting accommodation of his or her disability . . . .*" (italics added)]; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 987 (2015-2016 Reg. Sess.) as amended May 27, 2015, p. 1 ["This bill makes it an unlawful employment practice under [FEHA] to retaliate or otherwise discriminate against a person who requests an accommodation. . . *for the person's known physical or mental disability . . . .*" (italics added)]; Sen. Com. on Judiciary, Analysis of Assem. Bill No. 987 (2015-2016 Reg. Sess.) as amended May 27, 2015 ["This bill would make it an unlawful employment practice under [FEHA] to retaliate or otherwise discriminate against a person who requests an accommodation . . . *for the person's known physical or mental disability . . . .*" (italics added)].)

16

nothing at all in the evidence to suggest that plaintiff thought defendant's scheduling was unlawful. And certainly there is no evidence to suggest that plaintiff actually conveyed to defendant any belief that defendant's actions were unlawful. The majority summarizes the evidence in the summary judgment papers concerning plaintiff's complaints to his employer on the last two days of his employment as follows:

"On April 22, 2013, Junior assigned plaintiff a shift that started at 11:55 a.m., the latest he had ever started a shift, and ended at 9:04 p.m. He had 'no problem' with the route that day because it still allowed him to be home in time for his son's dialysis. But he told Junior: 'Please, I need to have my job like always. I've always had help from everyone except you.'

"The following day, on April 23, 2013, Junior assigned plaintiff a shift beginning at 12:00 p.m. Unlike the previous day, this assignment was for a route from Los Angeles to Oxnard and back, including multiple pickups and deliveries. Plaintiff explained to Junior that it was too late in the day for him to drive that route because he could not get back in time to administer dialysis to his son by 8:00 p.m. Plaintiff requested another route or simply to take that day off. He also reminded Junior that Bermudez had already talked to Junior about plaintiff's need for shifts enabling him to leave early for his son.

"When plaintiff complained to Junior, Junior laughed and said, 'Winston [Bermudez] doesn't work here anymore. Now it's me.' Junior told plaintiff that if he did not do the route, he was fired. Plaintiff said he was sorry, but he could not do it. Junior told him to return the next day to sign the termination paperwork." (Maj. opn. *ante*, at p. 5.)

The majority finds these statements by plaintiff may be reasonably understood to constitute "opposition to a practice he believed was unlawful." (Maj. opn. *ante*, at p. 23.) I think it is unreasonable to interpret plaintiff's complaints as opposition to a practice he believed was unlawful. Plaintiff's statements are only reasonably understood as a request for a different route, with no hint that he believed he had a lawful right to a different route or that it was discriminatory to refuse to give him a different route.

17

The majority likens this case to *Yanowitz*, where the plaintiff did not explicitly state to her superior that she believed his order to terminate a sales associate, because the associate was " 'not good looking enough,' " constituted unlawful sex discrimination. (*Yanowitz, supra,* 36 Cal.4th at p. 1044.) But in *Yanowitz*, the evidence permitted a finding that, in view of the nature of the order, the plaintiff's "refusal to implement the order, coupled with her multiple requests for 'adequate justification,' sufficiently communicated to [her superior] that she believed that his order was discriminatory." (*Id.* at p. 1048.) There is no comparable evidence here that plaintiff believed defendant's scheduling was discriminatory or that he conveyed that belief to defendant. "Standing alone, an employee's unarticulated belief that an employer is engaging in discrimination will not suffice to establish protected conduct for the purposes of establishing a prima facie case of retaliation, where there is no evidence the employer knew that the employee's opposition was based upon a reasonable belief that the employer was engaging in discrimination." (*Id.* at p. 1046.)

I would affirm the grant of summary judgment for defendant. I would reverse the trial court's order awarding defendant its costs and remand for a ruling under the standard announced in *Williams v. Chino Valley Independent Fire Dist.* (2015) 61 Cal.4th 97, 99-100 ("an unsuccessful FEHA plaintiff should not be ordered to pay the defendant's fees or costs unless the plaintiff brought or continued litigating the action without an objective basis for believing it had potential merit").


GRIMES, J.

18